BRADLEY *v.* BOARD OF STATE CANVASSERS.

WARNER *v.* SAME.

1. JURISDICTION—COURTS—ADVISORY JURISDICTION.
   This court does not act in an advisory capacity; and whenever it is convinced it has no jurisdiction in the premises, or that its orders are not capable of enforcement, it will, without suggestion, deny jurisdiction, notwithstanding both parties assert it.

2. SAME—CONSTITUTIONAL LAW—DIVISION OF POWERS—COURTS—STATE OFFICERS—POLITICAL ACTION—CONTROL BY COURT.
   Though the board of State canvassers is a constitutional body, its duties, under Act No. 4, Ex. Sess. 1907, are not political merely, and so beyond judicial direction and control, but are statutory duties of private and public interest and concern, the performance of which may be compelled by the courts.

3. STATUTES—CONSTRUCTION—NULLIFYING STATUTE.
   The court will decline to nullify a statute by construction unless the duty to do so is clear.

4. ELECTIONS—PRIMARY ELECTIONS—RECOUNT—BOARD OF STATE CANVASSERS—POWERS.
   Under section 41, Act No. 4, Ex. Sess. 1907, the power of the board of State canvassers, when a recount of the ballots cast at primary election is demanded, extends only to a recount of the ballots in the ballot boxes brought before them, and they have no power to compare the enrollment lists with the poll lists and draw from the box as many ballots as the comparison shows were cast by unenrolled voters. McALVAY, J., dissenting.

Mandamus by James B. Bradley to compel the board of State canvassers to proceed with a recount in accordance with relator's interpretation of the primary election law.

Prohibition and mandamus by Fred M. Warner to compel said board to refrain from recounting in accordance with a ruling of said board, and to proceed in accordance with relator's interpretation of said law.   Submitted Sep-

tember 25, 1908.    ( Calendar Nos. 23,068, 23,068½.)    Writ
denied to relator Bradley, and granted to relator Warner
September 28, 1908.

*Watts S. Humphrey, George W. Weadock,* and
*Charles W. Nichols,* for relator Bradley.

*Otto Kirchner, Alex. J. Groesbeck,* and *Fred C.
Wetmore,* for relator Warner.

*John E. Bird,* Attorney General, *Henry E. Chase,*
Deputy Attorney General, and *Thomas Ambrose Law-
ler,* Assistant Attorney General, for respondent.

OSTRANDER, J.    Under the provisions of section 41 of
Act No. 4 of the Extra Session of 1907, a recount of the
votes cast in certain election precincts of the State at the
primary election held in the State on September 1, 1908,
was demanded by James B. Bradley, a candidate at said
election for nomination to the office of governor on the re-
publican ticket.    One of his opponents, Fred M. Warner,
thereafter demanded a recount of the votes cast at said elec-
tion in other designated election precincts.    Apparently
each of these gentlemen received more than 40 per cent. of
the votes cast at said election by republican voters for can-
didates for said office.    Each claims to have received, if
only legal votes are counted, a plurality of votes.    Such pro-
ceedings were had by the board of State canvassers that a
recount of ballots in the designated precincts was entered
upon and proceeded to a point where said board made
certain rulings with respect to its powers in the premises
and the manner of conducting said recount, which rulings
were opposed to the contentions of both of said petitioners.
The relator James B. Bradley thereupon petitioned this
court for a writ of mandamus to compel said board of
State canvassers to proceed with said recount in accord-
ance with the contention of relator, and the relator Fred
M. Warner petitioned this court for an order prohibiting
a recount in accordance with the ruling of said board, and

for a writ of mandamus commanding the board to proceed with the recount in accordance with the contention of said relator. Both relators are therefore persons who claim to have acquired rights under and by virtue of the operations of the law in question, and both have submitted the matters in issue to the judgment of this court.

To each of these petitions the respondent board of State canvassers has made answer, and has asserted, among other things, in answer to the petition of relator Bradley:

"That the board of State canvassers is invested with the power and authority to finally determine whether as a board of State canvassers or as a recount board who was elected as a party candidate for the office of governor; that, being charged with such duty, its determination as to means employed or the method to be pursued are not matters which are subject to the review of any other tribunal, but that the said primary election law being enacted for the purpose of taking the place of a convention for the nomination of party candidates for office and the only right of either candidate at this time under this recount being to have a correct and accurate recount of the said ballots in question made, and this right not being in the nature of a franchise or office, and the said board of State canvassers having determined to employ the same means to make the recount of the ballots in question that were open to the board of election inspectors in counting the ballots, the said board of State canvassers is acting within the language of the statute, and its determination is final and conclusive on all parties, and is not open to question or review."

It is necessary, to a correct understanding of the questions presented, that a somewhat extended reference be made to the statute. It is entitled:

"An act relative to the nomination of party candidates for public office, and delegates to political conventions; to regulate primary elections and to prescribe penalties for violation of its provisions."

Approaching directly those provisions with which we are concerned, we find, *first*, that the provisions of the general election laws, applicable and not changed by pro-

visions of the act in question, are adopted, by reference or otherwise, as governing the actions of those who, in the first instance, have official relations with the ballots, the election, and the counting and return of votes.  No one but an enrolled voter is by law permitted to vote at any primary election, and the method to be pursued by one desiring to be enrolled is specifically set out.  Enrolled voters belonging to one political party may not lawfully vote for the candidates of a different political party.    The names of enrolled voters are recorded in an enrollment book, which, in most respects, in a primary election, answers the purposes of a registration list in a general election.

" SEC. 35. After the polls are open at a *primary election, any elector who is legally qualified and enrolled as hereinbefore provided, shall, before entering the booth, be furnished a ballot of the political party with which he is enrolled, and no other.  It shall be incumbent upon him to state to the inspector who has the ballots in charge, the party ballot he desires, which, if he is enrolled as a member of the party represented by said ballot, and if his right thereto is not challenged, shall be delivered to him forthwith.  Any voter enrolled as a member of any political party for which no ballots have been prepared, shall not be permitted to vote any other party ballot at such primary election.  It shall be competent for any enrolled voter or primary election inspector present to challenge the right of anyone offering to vote, on the ground that he is not a legal voter in that precinct, or that he belongs to a political party other than that represented by the ballot for which he has asked.  When the right of any enrolled voter to a ballot is challenged he shall be required to take and subscribe an oath that he is a qualified enrolled voter and has the qualifications of a voter and that he believes in the principles of the political party represented by the ballot for which he has asked.
\* \* \*

" SEC. 36. The enrolled voter, after having received his ballot, shall enter a booth, and while there concealed from view prepare such ballot by making a cross in the square at the left of the names of such candidates as he may desire to vote for, but in no case for more candidates for any office than is indicated under the title of such office.  He

may, however, vote for any person whose name is not printed on the ballot by inserting such other name in such manner as shall make it a substitute for any name which is printed thereon or where no candidate's name appears upon the ballot.    He shall then fold the ballot so that the perforated corner having within ballot number shall be on the outside, and present it to the proper inspector, who shall tear off the number and deposit the ballot in the ballot box.    When an enrolled voter asks for a ballot the inspector shall enter his name upon the poll list, the name of the political party and the number of his ballot, before the same is given to voter, and the inspector receiving the ballot shall, before depositing it in the box, ascertain by comparison with the poll list whether it is the same ballot given to such voter, and if it is not the same ballot he shall reject it and such voter shall not be allowed to vote at such primary election.    If any enrolled voter shall, after marking his ballot, so expose it to any person as to reveal the name of any candidate voted for thereon, such ballot shall be rejected and such enrolled voter shall forfeit the right to vote at such primary election, and a brief minute of such occurrence shall be made in the enrollment book and upon the poll list opposite the name of such enrolled voter.    Challengers appointed by the several political parties shall be allowed to be present with the same powers as are provided by law for general elections.

"SEC. 37.    After the closing of the polls on the day of holding of any primary election, the ballots shall be counted as provided by law for the counting of the ballots of any regular election.  ·  In counting such ballots only those candidates for nomination to office who have a cross made in the square at the left of their names shall be deemed to have been voted for, and any ballot upon which more candidates for any office have been voted for than may, by law, be elected to such office, shall be rejected as to all names appearing for that office.    The required number of electors who receive the highest number of votes for delegates to the county convention of any political party shall be declared by the board of primary election inspectors to be elected.    Said board shall certify to the county clerk the names of the electors so elected as delegates, naming the political party upon whose ballots such electors were elected.    Said board shall also certify to each delegate so elected his election as such delegate.    The county clerk shall certify to the chairman of each political party of the

county the delegates elected by each such political party as delegates to the county convention.

"SEC. 38. After the votes at any primary election in any election precinct shall have been counted, the officials counting the same shall publicly declare the result, and forthwith make and certify written detailed statements, such as are required by law for general elections, except as hereinafter provided, showing the whole number of votes cast in such election precinct for each candidate voted for on each party ballot, and shall certify, subscribe and seal in a separate envelope such statements and one of the tally sheets, and write thereon the name and number of the election precinct, if any, and deliver such statements and tally sheets to such persons and at such times as are required by law for general elections. As soon as they have completed the counting of the votes of their respective precincts they shall return all the ballots voted to the ballot boxes, which shall be locked and sealed, and such ballot boxes, and all books, unused ballots, supplies, lists and subscribed oaths shall be safeguarded and returned in the manner provided for by law governing general elections.

"SEC. 39. The returns of said primary election shall be canvassed and the results declared in the same manner and within the same time after the primary election and by the same officers as is provided by general law for canvassing the returns of and declaring the result in city, county, district and State elections, except that in the case of nominations for United States senator, governor, or lieutenant governor, or officers from districts comprising more than one county, the county clerk of each county affected shall transmit to the secretary of State, within ten days after the primary election, certified copies of the number of votes received by each of the candidates for the nomination of any of the said offices. The secretary of State shall appoint a meeting of the board of State canvassers at his office not later than twenty days after the primary election, which date shall be certified to the chairman of the State central committee of each political party, for the purpose of canvassing the votes of the candidates for such office. The said board shall proceed in the same manner in canvassing the votes, certifying, recording and determining results, etc., for nomination for United States senator and governor and lieutenant governor as is done in canvassing the votes in the case of election of State officials. In canvassing the votes of

candidates for members of congress, State senators and representatives in the legislature, in districts composed of more than one county, said board shall proceed in like manner as is done in the canvassing of votes cast for members of congress.    *    *    *

"SEC. 41. Any candidate voted for at any primary election provided for in this act, who conceives himself aggrieved on account of fraud or error by the board of primary election inspectors, in the count of the votes cast, or the returns made by said board, may, on or before the close of the day or days upon which the board of State, city, or county canvassers meet, present to and file with the chairman of the particular board, a written or printed petition, which shall be sworn to, and shall set forth, as near as may be, the nature of the errors or fraud complained of, and the particular township, ward, or precinct in which the alleged irregularities occurred and ask for a recount of the votes cast therein.    Such petitioner shall at the same time deposit with the chairman of said board the sum of ten dollars for each and every township or ward, the vote of which he requests to have recounted by said board:    *Provided*, That no candidate shall be required to deposit more than one hundred dollars.    When said petition is filed and the amount herein prescribed is deposited, and after giving at least twenty-four hours' written notice thereof to the opposing candidate, by handing to such candidate a copy of the petition, or if such candidate cannot be found, by leaving such copy at his place of residence, with some person of suitable age, it shall be the duty of said board of canvassers to designate a time and place when the facts set forth in said petition shall be investigated and when the ballot boxes used in such election in such township or ward shall be brought before it.    The said board shall thereupon, in some public place where the interested candidates and their counsel may be present, if they so desire, proceed forthwith to open the ballot boxes from such townships or wards and to make a recount thereof as to such candidates, and make a correct and complete return in writing showing the full number of votes cast and the names of the candidates and the number of the votes given to each.    When the recount of each box is completed the said board shall at once return the ballots thereto, carefully lock and seal same, and deliver the ballot boxes to the officer having the care and custody thereof. The returns made by the said board of canvassers upon such

recount shall be deemed to be correct, anything in the previous return from such township, ward or precinct, to the contrary notwithstanding. In all cases where, by reason of such recount, the petitioner succeeds in establishing fraud or mistake sufficient to change the result, the money deposited by him shall be refunded; otherwise it shall be turned into the treasury of the State, county or city, as the case may be. If two or more candidates of the same political party are tied for the same office, the tie shall be determined by lot to be cast then and there as the canvassing board may direct."

Counsel for the respondent board and for relator Warner are agreed that the board of State canvassers may do those things, and those only, which the inspectors of election may do in counting the votes. The board determined, and ruled, over the objection and protest of Mr. Warner, that it had authority to compare the poll list and the enrollment list or book in each voting precinct for the purpose of ascertaining whether the persons whose names appeared upon the poll list were enrolled as republican voters. If, upon such inspection of the record, it appeared that one not enrolled as a voter, or one enrolled as a voter of different political faith, had voted for either candidate, votes so cast were treated as illegal votes, not entitled to be counted. The effect in the particular case stated in the petition was this: It appeared from a certified copy of the enrollment book in the office of the secretary of State that in one township certain persons, to the number of 11, had enrolled on August 31, 1908, which day was not a legal enrollment day. We assume, although it is not so expressly averred in the petition, that these same persons as appeared from the poll list voted at the primary. They also found by a similar comparison that three persons, enrolled as democrats, voted at said primary election as republicans. They drew from the box indiscriminately 14 ballots. They proceeded to count the remaining ballots. It is the contention of Mr. Bradley that the board has authority to compare the enrollment book and the poll list as it did do, but that it should have

refused to count the remaining ballots for either candidate unless the legal vote cast in the precinct was made to appear. He further contends that the board may, and should, go behind or outside of the enrollment book and receive, and use as a basis for its conclusions, parol and other evidence of illegal enrollment and illegal voting. It is urged that, if the consequences of thus securing the legal rights of an aggrieved candidate and the political rights of the electorate is a delay so great that no candidate of the party can be presented to the electors at the November election, then the court should hold the act invalid because incapable of being given effect. In no other way is the validity of the act, directly or indirectly, questioned.

An analysis of the views of the able counsel who have aided the court in briefs and in oral arguments discloses few points of essential difference. We have noted the suggestion, not pressed at the hearing, that the respondent board is not subject to judicial direction or control with respect to the duties and performance thereof devolved upon it by this statute. It was also said at the hearing that the conclusions which the court shall announce are advisory. If the court was convinced that it had no jurisdiction in the premises, or that its orders were not capable of enforcement, it would, without suggestion, deny jurisdiction, although relators have both of them asserted it. We have considered the point. We are agreed that, while the board of State canvassers is a constitutional body, it is performing in this instance statutory duties; its authority in the premises being derived wholly from the legislature. The board (and so the members thereof) is by law charged with the performance of duties of private and public interest and concern. The duties are not political merely, and performance does not involve the exercise of powers belonging to a co-ordinate branch of government. That performance of such duties may be compelled is not open to question. And, if a particular method of performance is pointed out by the legislature

to reach a result which is also clearly indicated, that method should be pursued, especially in cases where pursuing a different method would or might involve a different result or no result at all. The exercise of certain powers having been provided for, the exercise of others not incidental or necessary to the exercise of those expressly given is forbidden. It is too late to deny the power and the duty of the judiciary to restrain such public officers performing such duties to the exercise of powers lawfully conferred to the use of means expressly indicated. In principle the point is ruled against the suggestion which is made by *Rich* v. *Board of State Canvassers,* 100 Mich. 453.

Aside from the matter of jurisdiction, counsel are agreed that the question presented is primarily one of construction of the statute. In what has been said we have indicated our view of the proper and necessary meaning of the law. The controlling language of the statute is:

"Any candidate * * * who conceives himself aggrieved on account of fraud or error by the board of primary election inspectors, in the count of the votes cast, or the returns made by said board, may * * *. Said board [respondent] shall * * * open the ballot boxes * * * and make a recount thereof * * * and make a correct and complete return in writing showing the full number of votes cast and the names of the candidates and the number of the votes given to each."

We find no ambiguity here. It is fraud or error by the board of inspectors in the count or in the return which may be investigated. What is provided for is a recount —another count—of the ballots. It seems to be conceded that neither relator occupies the position de facto or de jure of a public officer, and that an inquiry now or hereafter in the nature of quo warranto proceedings cannot be instituted by a candidate. In short, the finality of the determination of the respondent board is admitted. While counsel for Mr. Bradley find in the act support for their contention—the essence of the reasoning employed by them

is that by force of a supposed, we may say a presumed, general intention of the legislature to secure as a final result an honest expression of the electorate—the court is driven to the necessity of finding in the act security for such an expression. If the language employed by the legislature was ambiguous, if upon it and the general purpose of the act an implication could be raised that the respondent board had power to do something more than the act appears to provide for doing, and if it were necessary, in order to make the legislation effectual, to indulge such an implication, then the possible or probable effects of differing interpretations might be, and ought to be, considered, and the result of such a comparison of results might be controlling of the proper interpretation. We have no such case. We do not find ambiguity in the language of the act, nor any necessary conflict between the general purpose of the legislation and the provision for a recount of votes. We find a provision for a recount of votes, for doing again what the inspectors of election have done. This conclusion is supported by a consideration of other provisions of the law. The fixing of dates for enrollment, and for the primary election, with reference to the constitutional general election day, is indicative of the legislative conception of the powers and duties of the respondent in the premises. But beyond this the object of the legislation, which is to secure direct voting for candidates for public office, could not be, in fact, accomplished if the inquiry proposed could be entered upon. Upon well-settled principles courts will decline to nullify a statute by construction unless the duty so to do is clear.

The court is not insensible to the argument that, unless the board of State canvassers exercises powers beyond those imported by the words employed in the statute, a defeated candidate may have no redress, a successful candidate may profit by illegal acts of voters and inspectors, and the will of the party electors, legally expressed, may be legally reversed. Every experiment in popular government has its attendant dangers. No individual or

public right would have been infringed if the legislature had made no provision for an appeal from the decison of the various boards of election inspectors. Holding, as we do, that the respondent board may lawfully do no more than recount the votes and declare the result in accordance with such count, it follows, as was indicated early in this opinion, that the powers conferred by the act are ministerial, and not judicial. It remains to apply the ruling to the facts. It is a mistake to suppose that the inspectors of election at a general or primary election may look beyond the poll lists and the ballots in the proceeding to count the votes. There is no provision of the law, to which we have been referred, which permits the drawing out of ballots, except when it appears that they exceed the number of ballots cast as shown by the poll lists. The enrollment book is to the primary election what the registration list is to the general election. It is supposed that no man will vote at either election unless there is found, or is presently made, record evidence of his right to vote. Such a record cannot be reviewed or changed for the purpose of affecting the count of the votes actually cast. And it was held in *May* v. *Board of Canvassers of Wayne County*, 94 Mich. 505, in considering action of a canvassing board under a statute, the provisions of which were broader than those now under consideration, that the board had no power to compare the registration lists with poll lists for the purpose of determining whether the votes of nonregistered persons had been received. We are of opinion that the respondent acted beyond its powers in a similar use of the enrollment list and in withdrawing from the ballot box of the township of Oliver 14 ballots, and that for anything made to appear such ballots should be counted as cast.

Mr. Justice McALVAY assumes in his opinion that the record of the party enrollment is the only basis for determining the fact that a candidate for governor has received the required 40 per cent. of lawful votes cast at the primary election. In this we think he is in error. It is

40 per cent. of ·the vote cast at the election which is required, a fact to be determined by the board of State canvassers, if no recount is demanded, from the returns. It is manifest that, in the absence of a contest between candidates, no recourse would be made by the board to the record of enrollment. There would be before the board nothing with which the record of enrollment could be compared. Whether, if there is a contest, the record of enrollment should be examined, depends, therefore, upon the construction of section 41 of the act.

The writ applied for by relator Bradley is denied, and the writs applied for by relator Warner are both of them granted. The good faith of the respondent board is in no manner questioned, and we assume it will be unnecessary that either writ shall actually issue. No costs will be awarded.

GRANT, C. J., and BLAIR, MONTGOMERY, HOOKER, and MOORE, JJ., concurred with OSTRANDER, J.

McALVAY, J. (*dissenting*). I am not able to agree with the majority of the court in the conclusions arrived at in the opinion filed.

I think that the distinction which seems to me very clear between recounts in election cases and this case under the primary election law has been lost sight of. The plain intent of this law was to correct abuses which had arisen under the convention system of making nominations, and give the individual member of a political party an opportunity to make his selection of candidates for office on his party ticket, and to have that selection counted as made by him. It was to remove all improper influence and manipulation from primaries and conventions, and to permit a political party to select its candidates as a distinct political organization unassisted by zealous and willing members of other parties. As a basis to this intended reform, party enrollments are provided for, recorded in books furnished by the secretary of State. Days upon which such enrollments may be lawfully made are fixed. All of

this, including all corrections, changes, new enrollments, are made a matter of record in the office of the secretary of State. No one may lawfully vote at any primary election who is not lawfully enrolled in the enrollment of the party to which he belongs or with which he affiliates. This enrollment is not for all its uses and purposes identical with a registration of voters. It performs some of the functions of a book of registration; but it has been adopted for other and different purposes. Its primary object is the separation of the voters in each precinct into the parties to which they belong, and to maintain such separation absolute and complete, and to prevent anyone from voting for party candidates not lawfully authorized so to do. This enrollment or a certified copy is before the inspectors of election of every precinct and the several canvassing boards of the districts and State. It is intended to be the preserver of party solidarity. The right to be declared the nominee of a party to a certain office is not the right to an office or a franchise, nor is it a constitutional right. But the machinery furnished by the legislature for the purpose of permitting the electorate of the different parties to confer such rights upon some of its individual members is within the powers given the legislature under the Constitution. The people have the right to have this machinery so operated that the plain legislative intent shall be given effect; hence the importance of a correct determination of the important question here involved. It is clear to my mind that the party enrollment is so carefully safeguarded by this statute because the legislature knew that the success or failure of this legislation depended upon it. If party lines could be unlawfully invaded at the ballot box by outsiders on primary election day without any possible check or redress, this last condition of party politics would be much worse than the first.

It appears to me that the legislature has provided both the check and the redress—the first by the party enrollment; the second by the recount. It is not contradicted that no one could vote except he was lawfully enrolled or en-

titled to enrollment in the party to which he claimed
fealty.   The statute provides the record to be duly made
if he is enrolled on election day.   I insist that this record
(the party enrollment) is the only authority for receiving
the party votes, and the only basis upon which may be
determined the fact that a candidate for governor has re-
ceived the required percentage of all the lawful votes cast
by his party for that office.   The general election laws of
the State are applicable to a primary election where such
laws or their construction already given will not contra-
vene the plain provisions and intent of such law, but to no
greater extent.   The general election laws know nothing
about parties except as printed upon a common ballot.
The primary law is based entirely upon party recognition.
Under the general election laws, an individual is given
his remedy by quo warranto to try the title to an office to
which he claims to be entitled.   Under the primary elec-
tion law, the party and the individual can only know
whether a lawful nomination has been made by having
recourse to a recount, and the legality of the votes cast
for the candidates of a party can only be determined by
the party enrollment which has been made the basis of
the proceeding from the beginning.

The case of *May* v. *Board of Canvassers of Wayne
County*, 94 Mich. 505, which is relied upon as determining
this case, is distinguishable, *first*, because the party had all
the remedy to redress his wrong by quo warranto; and, *sec-
ond*, because it was an election to an office, and not a
party primary, and the registration excluded was not
identical with the party enrollment.   It was not before
the canvassing board, and could not be there lawfully.
From it the board was not required, as in the case at bar, to
determine that a candidate had received 40 per cent. of all
the votes lawfully cast before such candidate could be de-
clared nominated for the office of governor.   I think the
argument is captious which confines the work of the board
to merely counting the votes in the boxes.   The statute
means the counting of the *lawful* votes cast, and the en-

rollment is the only guide which points out such votes.  I also consider the argument that sufficient time does not intervene in which the respondent board may complete its recount of no force.  No such presumption arises, and no facts appear to create it.  To me the view of this statute taken by the respondents is a rational one.  By it nothing is considered except such matters as are of record, and, in fact, before them.  They are vested with the same powers as the several boards of inspectors in so far as said inspectors have acted within the law, and, if said inspectors have unlawfully allowed votes to be cast by men not lawfully enrolled, respondents may and should correct such unlawful action by drawing out the surplus votes. Other errors pointed out by the general law the board have authority to correct.  No authorities in like cases have been furnished by counsel.  Primary election laws are of recent growth.  The utmost care should be taken in their construction, and to give them effect if possible, or to point out clearly and logically the reasons why such effect cannot be given.

It seems to me that the logical conclusion of the majority opinion is to hold the statute invalid and incapable of being made effective to carry out the plain legislative intent.  A well-settled principle of statutory construction is that effect will if possible be given to the legislative intent. In this case, to give such intent effect and save this remedial legislation and make it workable requires no strained construction.  It only permits the officers to use the material put into their hands by the legislature with the clear intent that it should be used.

The prayers of the petitioners in both cases should be denied.