**WAGONER COUNTY ELECTION BOARD and John W. Russell, Appellants,**

v.

**Warren D. PLUNKETT and Tom Payne, Jr., Appellees.**

**No. 37561.**

Supreme Court of Oklahoma.

Dec. 14, 1956.

Rehearing Denied Dec. 21, 1956.

Earl Youree, Wagoner, Green & Green, Sallisaw, for appellants.

Bailey & Pitchford, Okmulgee, Smith & Douglass, Henryetta, for appellees.

PER CURIAM.

It is alleged in plaintiffs' separate petitions in the District Court of Wagoner county that illegal absentee ballots were cast in the run-off primary election for

State Senator held on July 24, 1956, and that such ballots were counted and considered by the Wagoner County Election Board in tabulating their returns. It is sought to change the result of the election by excluding, in these actions, the absentee ballots which are alleged to be illegal and improperly counted by the Wagoner County Election Board. While numerous assignments of error are made it is suggested that we first determine the question of the jurisdiction of the District Court to entertain these actions.

The facts are that John W. Russell, Jr., and Tom Payne, Jr., were candidates for State Senator from the district comprising Okmulgee and Wagoner counties in the run-off primary election held on July 24, 1956. Russell received a majority of the votes and Tom Payne, Jr., filed application with the State Election Board for a recount of the ballots cast in Wagoner county. The State Election Board referred the matter to the County Election Board for recount pursuant to the provisions of 26 O.S.1951 § 391. The District Judge determined that the ballots, including absentee ballots, had not been exposed to the reach of unauthorized persons and in conjunction with the County Election Board proceeded to conduct the recount. Of 976 absentee ballots cast in the election the Board determined to count as legal ballots a total of 711. Plaintiff, Payne, receiving 24 and Russell 687.

On July 30, 1956, and before the results of the recount had been certified to the State Election Board, the two actions involved in this appeal were filed in the District Court of Wagoner county. One action is by Warren D. Plunkett, a Democrat voter in Wagoner county who voted for Tom Payne, Jr. The other action was filed by Tom Payne, Jr., a Democrat voter and candidate residing in Okmulgee county. These petitions separately allege that the County Election Board, and its members, had failed and refused in their recount to properly determine the qualifications of absentee voters and to properly determine whether the absentee voters had complied with statutory requirements in the procurement and voting of absentee ballots.

The plaintiffs, Plunkett and Payne, further allege in their separate petitions, and pray, that the District Court direct all absentee ballots be brought into court; that plaintiffs be permitted to present evidence to the court regarding the illegality of the absentee ballots; and that the County Election Board and its members be restrained from certifying the results of their recount to the State Election Board, until plaintiffs are permitted to present evidence to the District Court in support of their petitions. They asked the District Court to determine which absentee ballots were legally cast and to count only those which the District Court determines to be valid, or if the District Court should determine that the absentee ballots were tainted with illegality to refuse to count any of them.

On the day the petitions were filed the District Court restrained the defendant County Election Board and its members from certifying the results of the recount to the State Election Board. Thereafter John W. Russell, Jr., filed an intervention in each of the cases.

For convenience Warren D. Plunkett and Tom Payne, Jr., will be referred to either by name, or as plaintiffs. The Wagoner County Election Board, and its members, will be referred to as defendants, or by name, and John W. Russell as intervenor.

Defendants filed answers and contended that the District Court was without jurisdiction to conduct a hearing on the matters set forth in plaintiffs' petitions. The District Court overruled pleas to the jurisdiction, and demurrers, and the cases were consolidated and came on for trial on September 17, 1956.

The District Court found that persons voted absentee ballots who were not absent from their voting precincts and were not suffering from sickness or disability; that some absentee voters did not sign their affidavits in the presence of the notary public who later completed the affidavits; and

that in a few instances a relative, or other person, other than absentee electors either marked the ballot or signed the affidavit. The court found that there was no fraudulent conspiracy to obtain illegal ballots by corrupt or illegal methods; ruled that these cases involve no use of relief fund checks; but did find that there were more than enough absentee ballots cast which failed to comply with the absentee ballot law to change the result of the run-off primary election. The court further found that it was not possible to determine with mathematical certainty the number of ballots so cast but gave no reason why such impossibility existed.

The District Court refused to recognize any of the absentee ballots voted in Wagoner county, including those admittedly legal, and restrained the County Election Board from including in the official returns to the State Election Board any returns from the absentee ballot box, or any result from the absentee ballots cast in said election. The defendant Board was further ordered to certify a return to the State Election Board without including therein the returns from the absentee ballot box. However, the Board was ordered to stay all proceedings under the judgment pending perfection of an appeal to this court and a determination of the same.

From the foregoing it is apparent the District Court rejected the recount conducted by the County Election Board and proceeded independently of the Board to try the issues set forth in plaintiff's petitions.

Defendants and Intervenor have appealed and with permission of this court have confined their argument to one proposition: "The District Court had no authority to enjoin the County Election Board of Wagoner county, Oklahoma, from certifying the results of the run-off primary election for State Senator."

Plaintiffs bring their actions as private citizens and electors under certain constitutional guaranties. "Free and equal elections" Art. 3, § 7; "purity of the ballot",

Art. 3, § 6; and "there can be no wrong without a remedy," Art. 2, § 6. They assert that in view of these constitutional provisions the courts must take jurisdiction where the Legislature fails to provide an adequate remedy or procedure to implement these constitutional guaranties.

In order to clearly recognize all of the legal problems raised by plaintiffs' petitions we feel that it will be helpful if we recognize Mr. Plunkett as a citizen and qualified elector in Wagoner county, and Mr. Payne as a qualified elector and candidate for nomination as State Senator by the Democrat party in the senatorial district.

Assuming, as argued by Mr. Plunkett, that he has a right to have his vote count for all it is worth and not in competition with illegal votes, we are confronted with the question of whether he has a right to bring an action in his own name for the relief demanded. It is recognized that his right is no greater than all those others who voted for Mr. Payne. He has no personal interest in the result of the election, and in our view no greater interest in free and equal elections and the purity of the ballot than other qualified electors in the senatorial district. The result he hopes to achieve by his action is to discard the alleged illegal absentee ballots and ultimately have his candidate declared the nominee of the Democrat party.

This court has heretofore held in numerous decisions that if the injury is one that particularly affects a person, he has a right to the action, but if it affects the whole community alike their remedy is by proceedings by the state through its appointed agencies. That is, by the county attorney or attorney general. Cheek v. Eye, 96 Okl. 44, 219 P. 833. See also Robison v. Chapman, 158 Okl. 244, 13 P.2d 173; and Frittz v. Thorpe, 149 Okl. 219, 299 P. 884.

In Garrett v. London, 107 Okl. 72, 229 P. 1074, it was held under Sec. 460, C.O.S. 1921, 12 O.S.1951 § 1533, that it is necessary that a private individual bringing an action to declare an election void, show

title to or interest in the office involved superior to that of other members of the general public; and unless such title or interest be shown, the action must be prosecuted by the state through its duly constituted authorities. In the body of the opinion, 107 Okl. at page 76, 229 P. at page 1078, it was said:

"* * * The statutes giving this right of action were intended to protect the interest of one claiming the office, but it nowhere appears that it was intended that an individual should be substituted the representative of the public at large to prosecute an action claiming the total invalidity of an election. The power and right to prosecute such action inheres in the sovereignty. * * *"

Our statute, 12 O.S.1951 § 1533, supra, was adopted from Kansas and it will be observed that the Kansas court has held to the same effect. Miller v. Town of Palermo, 12 Kan. 14. See also O'Brien v. Gassoway, 125 Okl. 97, 256 P. 929.

In 74 C.J.S., Quo Warranto, § 1b, pages 174–175, it is said:

"* * * The ancient writ [of quo warranto] was in the nature of a writ of right for the king, against him who claimed or usurped any office, *franchise, or liberty,* to inquire by what authority he supported his claim, in order to determine the right, * * *."

In 74 C.J.S. Quo Warranto, § 28, page 222, it is said:

"Unless the case is within a statute authorizing him to do so, * * * a private person cannot bring a quo warranto action or proceeding in his own name, or in the name of the state, attorney general, or prosecuting attorney, independently of the attorney general or prosecuting attorney; * *."

Since Mr. Plunkett has no personal interest in the nomination, and no greater interest in "free and equal elections" and the "purity of the ballot" than other qualified electors in the district we must conclude that he could not, as an individual,

bring an action to contest the validity of the absentee ballots.

It may properly be argued that Mr. Payne has a pecuniary interest in the nomination and a greater interest in "free and equal elections" and the "purity of the ballot" than other qualified electors in the senatorial district. However it must be recognized that this greater interest results from his candidacy and that his rights as a candidate are governed by other provisions of the statutes.

In 26 O.S.1951 § 391, it is provided that the right to a certificate of party nomination shall not be considered a property right to any extent whatsoever, unless and until such right to such certificate shall be determined and the certificate issued in the manner provided by law.

In 12 O.S.1951 § 1531, it is provided that civil actions may not be maintained to contest a primary election. The section provides:

"The writ of quo warranto and proceedings by information in the nature of quo warranto, are abolished and the remedies heretofore obtainable in those forms may be had by civil action; provided, that such cause of action may be instituted and maintained by the contestant for such office at any time after the issuance of the certificate of election by the state, county, township, or city election boards, and before the expiration of thirty days after such official is inducted into office; * * * and provided further, *that this Act shall not apply to primary election.*" (Emphasis supplied.)

The quoted section of the statute was enacted in 1925 as Senate Bill No. 395, S.L. 1925, page 145. Recognizing this section of the statute in 1926 in Dabney v. Hooker, 121 Okl. 193, 249 P. 381, this court held in the first paragraph of the syllabus:

"At common law, there existed no right to contest in the courts the title to the nomination of a political party for public office, and none now exists

unless specifically provided for by statute."

In the body of the opinion, 121 Okl. at page 194, 249 P. at page 382, it was said:

"Is there any authority, statutory or otherwise, which provides for a contest of this nature? At common law there existed no right to contest in the courts the title to the nomination of a political party for public office. Jarman v. Mason, 102 Okl. 278, 229 P. 459; Lansdon v. State Board, 18 Idaho 596, 111 P. 133; State ex rel. Hatfield v. Carrington, 194 Iowa 785, 190 N.W. 390; Bradley v. Board [of State Canvassers], 154 Mich. 274, 117 N.W. 649; State v. Woodruff, 68 N.J.L. 294, 52 A. 294.

"* * * and, as the law now stands, there is no provision of the statutes of this state authorizing a plenary action for the contest of a primary election; such rights being purely political, it could not exist except by virtue of some statute authorizing the same."

This court has consistently adhered to the rule announced in the Dabney case for more than thirty years. See Looney v. County Election Board of Seminole County, 145 Okl. 25, 291 P. 554, 71 A.L.R. 420; Brickell v. State Election Board, 203 Okl. 362, 221 P.2d 785, 788. In the body of the opinion in the Brickell case it is said:

"This court is committed to the rule that at common law there existed no right to contest the title to the nomination of a political party to public office in the courts and none now exists unless specifically provided for by Statute."

In 18 Am.Jur. Elections—§ 272, at page 359, it is said:

"It is a firmly established general rule that the jurisdiction of courts exercising general equity powers does not include election contests, unless it is so provided expressly or impliedly by organic or statute laws. The reason for this exclusion is that the questions involved are political and that the right to public office is not considered as constituting property in such sense as will warrant the intervention of equity to protect it. * * * Accordingly, a court of equity will not restrain officers on whom devolves the duty of declaring the result of an election from performing their duty or enjoin the issuance of a certificate of nomination to a successful contestee in a primary election contest."

It is pointed out in argument that Art. 2, § 6, Okl.Const., requires a remedy for every wrong, and in this connection it is argued that the courts must take jurisdiction where the Legislature fails to provide a remedy. The ultimate conclusion from this argument is that the Legislature has not provided an adequate remedy and that the courts must take jurisdiction and create a remedy. In considering this proposition we cannot be unmindful of the fact that the Legislature has provided that the right to a certificate of nomination is not a property right, 26 O.S.1951 § 391, supra. Nor can we ignore the fact that the Legislature has provided that civil actions may not be maintained in the courts to contest primary elections. 12 O.S.1951 § 1531, supra.

In Adams v. Iten Biscuit Co., 63 Okl. 52, 162 P. 938, 942, in the body of the opinion this court said:

"* * * The mandate of section 6, art. 2, of the Constitution is:

"'The courts of justice of the state shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice.'

"That this was a mandate to the judiciary and was not intended as a limitation upon the legislative branch of the government seems clear. Neither do we think it was intended to preserve a particular remedy for given causes of

action in any certain court of the state, nor was it intended to deprive the Legislature of the power to abolish remedies for future accruing causes of action (where not otherwise specifically prohibited), or to create new remedies for other wrongs as in its wisdom it might determine. Section 36, art. 5, declares that:

" 'The authority of the Legislature shall extend to all rightful subjects of legislation.' "

■ In State ex rel. Decker v. Stanfield, 34 Okl. 524, 126 P. 239, 241, this court held:

"We think this section of the Constitution [Art. 2, Sec. 6] must be enforced, but that it must be enforced in accordance with the law. We do not think it means that, regardless of the statute, * * * courts shall proceed in violation of the law."

■ We have considered the problem under comparable equitable principles. In 30 C.J.S., Equity, § 105, page 506, it is said: "Equity Will Not Suffer a Wrong to Be without a Remedy." However, the courts have recognized that this right to a remedy is not an absolute right. There are numerous classes of cases where equity will not afford relief. Thompson v. Allen County, 115 U.S. 550, 6 S.Ct. 140, 29 L.Ed. 474; 30 C.J.S., Equity, § 105, page 507.

We have also considered the question of whether it is the duty of a court of equity to take jurisdiction where, as here, there was not sufficient time for the parties to present their case to the trial court, nor sufficient time for an appeal. The record discloses that on the fourth day of the trial the court in effect directed the plaintiff, Payne, to close his case on the following day. The plaintiff objected and was overruled. On the following day plaintiff again objected to his evidence being curtailed and made an offer of additional proof. Defendants joined in requesting that plaintiff be given time to try to make the proof he offered, but the objection was overruled and the offer of further

proof by plaintiff was denied. The court, in effect, required defendants to close their case on September 28th, after consuming three and one-half days in presenting their evidence, and denied their offer of further proof. Plaintiff was denied time to present rebuttal testimony. It is quite evident the trial court felt compelled to make these rulings in order to leave some time for an appeal to this court.

If it may be assumed that the trial court was under duty to assume jurisdiction then it must necessarily follow, in the absence of statute, that the unsuccessful litigant would have the right to take an appeal. Is it the duty of the trial court to assume jurisdiction when it is apparent that there will be insufficient time to complete an appeal before the date for the next election and where the questions may be rendered moot for lack of time to present the appeal? Is this court authorized to postpone the next election day in order to provide time for an adequate remedy? In 30 C.J.S., Equity, § 16, page 336, it is said:

"A court of equity will not do a useless or vain thing, and will not require the doing of a vain or useless thing or the performance of an impossible act. So, even though the court has jurisdiction, it will not lend its powers to accomplish a useless purpose, nor will it grant a decree which does not confer any real benefit or effect any real relief, which is impracticable to carry out, which is not enforceable, or which is nugatory or ineffectual because compliance therewith is impossible. Courts also refuse to grant equitable relief where, if granted, one of the parties may nullify the action so taken by the exercise of a discretionary right which * * * the law * * * has conferred on him."

■ We hold that Art. 2, § 6, Okl. Const., supra, is not intended as a limitation upon the legislative branch of the government where the legislation involved deals with rightful subjects of legislation. Adams v. Iten Biscuit Co., 63 Okl. 52, 162

P. 938, supra. We further hold that 26 O.S.1951 § 391, and 12 O.S.1951 § 1531, as herein construed, are rightful subjects of legislation.

■ It would be incorrect to assume that a candidate is wholly without any remedy in contesting primary and run-off elections. In 26 O.S.1951 § 391, the Legislature has provided a comprehensive plan for a recount hearing before the County Election Board. Mr. Payne availed himself of this remedy. It may be said with some justification that the extent and scope of the contest therein. provided is not entirely clear, and that our decision in Brickell v. State Election Board, 203 Okl. 362, 221 P. 2d 785, does not clarify it. While the issues in the cases before us do not require a construction of Section 391, or suggest that we reconsider our opinion in the Brickell case, we are firmly convinced that the Legislature intended that the recount hearing would be exclusive of all other remedies in primary elections. The correctness of this conclusion is emphasized by the provisions of 12 O.S.1951 § 1531, supra, which forbids civil actions in contesting primary elections.

■ Although the time for holding the general election has passed, we are of the opinion and hold that the district court had no jurisdiction to try and determine the issues raised by plaintiffs in their separate petitions. It follows that it was the statutory duty of the County Election Board to certify to the State Election Board the returns of the Wagoner county election as reflected by its recount, and to include therein the results of their recount of the absentee ballots.

The orders and judgments of the district court are reversed and vacated as being void for lack of jurisdiction of the district court to make them.

JOHNSON, C. J., WILLIAMS, V. C. J. and WELCH, DAVISON, JACKSON and CARLILE, JJ., concur.

CORN, HALLEY and BLACKBIRD, JJ., dissent.

The court acknowledges the aid of the amicus curiae brief of Hardin Ballard, attorney, Purcell, Oklahoma, former Senator and author of Senate Bill No. 139, S.L. 1931, pp. 97, 101, 26 O.S.1951 §§ 391 & 392.

DAVISON, Justice (specially concurring).

I fully agree with the majority opinion. I feel, however, that I should elaborate on the right of the Legislature to provide for proper election laws and then to discuss the provisions of the laws promulgated by that body.

With reference to elections the Oklahoma Constitution specifically provides (Emphasis ours):

Art. 3, § 4: "The Legislature shall enact laws creating an election board, * * * and shall provide the time and manner of holding and conducting all elections; * * *".

Art. 3, § 5: *"The Legislature shall enact laws providing for a mandatory primary system,* which shall provide for a nomination of all candidates in all elections for State, District, County, and municipal officers, for all political parties, including United States Senators; * * *."

Art. 3, § 6: "In all elections by the people the vote shall be by ballot and the Legislature shall provide the kind of ticket or ballot to be used and make all such other regulations as may be necessary to detect and punish fraud, and preserve the purity of the ballot; * * *".

These provisions of the Constitution make it perfectly plain that it is the Legislature that has the power to make laws to preserve the purity of the ballot.

The only statutory law now in effect with reference to a run-off primary election contest, or recount, is 26 O.S.1951 § 391, supra. That section of the statute confers jurisdiction upon the County Election Boards to conduct recounts under the super-

vision of a district judge and provides procedure therefor.

Prior to 1925 a defeated candidate had two remedies for contesting an election. His first remedy was a recount of the ballots. If he lost the primary election on recount he had a remedy by an action in quo warranto to try title to the nomination. Whitaker v. State ex rel. Pierce, 1916, 58 Okl. 672, 160 P. 890.

In 1925 the right to contest a primary election by quo warranto was abolished by the Legislature. Senate Bill No. 395, S.L. 1925, page 145. That provision of the law is still in effect and is found in Title 25 O.S.1951 § 1531. It authorizes a civil action in the courts to contest a general election, but specifically provides it shall not apply to primary elections.

In Dabney v. Hooker, 121 Okl. 193, 249 P. 381, in a civil action in the district court of Oklahoma County, to try title to the nomination for Attorney General, this court recognized that the old remedy of quo warranto in primary elections had been abolished in 1925 and held in the first paragraph of the syllabus as follows:

"At common law, there existed no right to contest in the courts the title to the nomination of a political party for public office, and none now exists unless specifically provided for by statute."

In the body of the opinion it was said:

"Is there any authority, statutory or otherwise, which provides for a contest of this nature? At common law there existed no right to contest in the courts the title to the nomination of a political party for public office. Jarman v. Mason, 102 Okl. 278, 229 P. 459; Landsdon v. State Board, 18 Idaho 596, 111 P. 133; State ex rel. Hatfield v. Carrington, 194 Iowa 785, 190 N.W. 390; Bradley v. Board [of State Canvassers], 154 Mich. 274, 117 N.W. 649; State v. Woodruff, 68 N.J.L. 294, 52 A. 294. * * *

" * * * and, as the law now stands, there is no provision of the statutes of this state authorizing a plenary action for the contest of a primary election; such rights being purely political, it could not exist except by virtue of some statute authorizing the same.

"The argument is advanced that to safeguard against fraud and corruption in primary elections a civil action should be allowed by this court to contest such elections. With this we do not agree. This is not a legislative but a judicial body. We are concerned only with the law as adopted by the lawmakers. It is apparent that the Legislature, at the time of the passage of the amendatory act of April 9, 1925, intended to abolish the plenary action for contest of primary elections, when they provided ' * * * that this act shall not apply to primary election.' At the time of the passage of said act, the Legislature * * * knew that it was inherently impossible to try by civil action a contest of a primary election between the date of such primary election and the general election, and for that reason, no doubt, limited the defeated candidate in a primary election to a summary proceeding by recount and mandamus to complete such recount as provided by statute. * * * They may have realized that it would be practically impossible for a defeated candidate in a primary election to institute an action to contest a primary election, try the same in the district court, and under the rules of procedure, grant the defeated party in such suit the right to appeal in the time intervening between the primary election and the general election. They also had knowledge, no doubt, that under our system of jurisprudence the question would become moot after the general election. * * *

"It has also been argued that a defeated candidate, who makes charges of fraud and corruption, should at least have an opportunity to establish the same by proof. Be that as it may there is no statutory law authorizing a con-

test of a primary election such as was instituted in the district court of Oklahoma county."

The rule of law established in the Dabney and Jarman cases was followed in Looney v. County Election Board of Seminole County, 145 Okl. 25, 291 P. 554, 71 A.L.R. 420.

In 1931, the Legislature passed Senate Bill 139, now 26 O.S.1951 § 391, providing for election hearings and recounts. There was apparent reason for the Legislature in the passage of this Act after providing for a comprehensive recount hearing by the Election Board in conjunction with the District Court, to use the following language in the same section:

"* * * and upon the completion of such hearing, the election board shall render its decision, and such decision shall be final and conclusive of all rights involved. No continuance shall ever be granted for such hearing for any purpose, and no appeal to or review by the court shall ever be taken or had from any final decision of the proper board so had governing any primary election. * * *

"It is the intention and purpose of this Act to prevent appeals or reviews of any kind or character and no court shall have jurisdiction of or authority to issue any enjoinder, proceeding, mandamus or process to inquire into, review or control the action of any election board pertaining to primary elections."

These statutory provisions were quoted and relied upon in plaintiff-in-error's brief, and no contention was raised in defendant-in-error's brief as to the constitutionality of either of said statutes or any part thereof.

The Legislature realizing that for a court to try a primary contest was, as pointed out in Dabney v. Hooker, supra, impractical, provided a procedure it thought would adequately protect the rights of all candidates. The recount contest provision provided that the recount should be conducted before the election board sitting in conjunction with the district judge. The Legislature no doubt thought such a remedy would fully and adequately protect the legal rights of all candidates. As a general rule, at least, the wisdom of the Legislature in this respect has been justified. For example in 1950 there were 471,773 ballots cast for the two gubernatorial candidates in the run-off primary. A state wide recount was granted covering all precinct votes and absentee ballots before the 77 different county election boards sitting in conjunction with a district judge which resulted in a net change of only 49 votes. This result spoke highly of the honesty, integrity, efficiency and impartiality of election boards throughout the 77 counties of the State. This recount was completed without delay. Had courts been permitted to assume jurisdiction after the recount it would have been possible that litigation might have been commenced in each of the 77 counties of the State. Such a situation, considering time necessary to complete the litigation in each county, and the time necessary for appeal and determination of the appeals in this court could have resulted in the name of neither candidate being placed on the general election ballot. Such would have created a chaotic condition. Such situations were no doubt foreseen by the Legislature causing the adoption of Sec. 391, supra.

The confusion in the present case has resulted from the legality or illegality of only *absentee ballots*. Perhaps the Legislature in enacting the "Absentee Ballot Law" was too liberal in allowing a legal voter to vote an absentee ballot, or too liberal in the procedure leading up to the casting of such a ballot. If this be so the Legislature, no doubt, will make more rigid requirements for legal voters desiring to vote such a ballot.

This court has consistently adhered to the rule announced in the cases cited herein, supra, for a period of thirty years. I think it is the only workable rule. In any event, as the instant case demonstrates, it would be manifestly impossible for this court to rule on a multiplicity of election appeals in

time to adjudicate the matters before the run-off and general elections.

WILLIAMS, Vice Chief Justice (concurring specially).

Although I could not agree with the former majority opinion herein, I feel it my duty to concur in the present one. In my view, the court now in effect holds that Mr. Payne was entitled to present his case to the Wagoner County Election Board sitting in conjunction with the District Judge upon occasion of the recount proceedings. That body and judge had the authority and duty to determine the legality of ballots duly challenged.

True, the people of Oklahoma have said in our Constitution, Art. II, § 6: "The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; * * *." Note absence of reference to political rights.

And further, Art. III, § 6: "* * * (T)he Legislature shall * * * make all such other regulations as may be necessary to detect and punish fraud, and preserve the purity of the ballot; * * *."

And, Art. III, § 7: "The election shall be free and equal * * *."

But they have also said, Art. III, § 4: "The Legislature * * * shall provide the *time* and *manner* of holding and conducting all elections; * * *." (Emphasis added.)

We are not here called upon to decide the constitutionality of 26 O.S.1951 § 391, nor to broaden its interpretation. Plaintiff Payne apparently abandoned his remedy under that provision of law and sought other redress in the proceeding from which arose this appeal.

I believe he was entitled in his recount proceeding to assert the alleged illegality of certain absentee ballots, notwithstanding the decision of this court in Brickell v. State Election Board, 203 Okl. 362, 221 P.2d 785.

After denial of such right by the Board and District Judge, in aid of securing that relief he would have been entitled to the issuance by this court of proper writ under our authority of superintending control. Const. Art. VII, § 2; Looney v. County Election Board of Seminole County, 146 Okl. 207, 293 P. 1056.

I therefore concur specially in the majority opinion.

WELCH, Justice (specially concurring).

In concurring the fact should be emphasized that in the case there was no issue of fraud; the only issues, as pointed out in the majority opinion, dealt with the legality of absentee ballots; that is, as to legal voters of Wagoner County, fully entitled to vote in this election, making good faith effort to vote by absentee ballot, the question was whether they made sufficient compliance with the technical statutory requirements to have their absentee ballots counted. Those issues could have been considered and determined in the recount hearing conducted by the District Judge in conjunction with the Election Board pursuant to 26 O.S.1951 § 391. That section, after reciting requirements as to service of notice, provides that the rehearing contest shall be set down

"for a day certain for hearing, same not to be more than twenty-four hours from the time of the completion of such service,"

and

"the said hearing shall be held in the court room of the District Court and it shall be the duty of a judge of said court * * * that he attend, and in conjunction with said County Election Board, to conduct such recount."

And in that section it is further provided:

"At said hearing, the parties in interest may, without further pleading, offer such legal evidence in support of and in opposition to such contest as they may have to offer, and upon the completion of such hearing, the election board shall render its decision,

and such decision shall be final and conclusive of all rights involved. No continuance shall ever be granted for such hearing for any purpose, and no appeal to or review by the court shall ever be taken or had from any final decision of the proper board so had governing any primary election. * * *

"It is the intention and purpose of this Act to prevent appeals or reviews of any kind or character and no court shall have jurisdiction of or authority to issue any enjoinder, proceeding mandamus or process to inquire into review or control the action of any election board pertaining to primary elections."

Thus, in addition to 12 O.S.1951 § 1531 quoted in the majority opinion, we have the above quoted statutory provisions against judicial review of recount hearings or judicial interference therewith.

These absentee ballots in Wagoner County were not originally counted by the election board on election day as provided by the statute, but it was specifically ordered and directed, in advance, by the district court of Wagoner county that the election board hold these ballots over and delay such original counting until the following day and then to count the absentee ballots in the presence and under the supervision of the district judge. These absentee ballots were counted on the day after the election, and with the presence of watchers or challengers by both of the parties to this controversy. Thereafter there was a recount in conjunction with the district judge, requested and granted under the statute. This might well indicate that in the counting and recounting of these absentee ballots, with the presence of watchers and challengers by both parties, each "Absentee Ballot" and "Affidavit of Absent Elector" was separately scrutinized and checked for decision as to the legality or illegality of the individual ballot, thus determining with mathematical certainty the number of legal ballots and the number of illegal ballots, a determination which the trial court found it impossible to make in the trial of this civil action which began more than a month and a half later.

If it be conceded that in the trial of this case the trial court found some illegal absentee ballots, then it must also be conceded that the court, in casting out all of the 711 absentee ballots which were counted, discarded some wholly legal absentee ballots, since it was never contended by any one that all the absentee ballots were illegal ballots; but the trouble there is that the findings and judgment do not disclose how many illegal ballots the court found. It is true that the trial court announced the general conclusion that there were enough illegal ballots to change the result of the election, but that conclusion cannot be checked with the findings of fact because the trial court did not find or ascertain the exact number of illegal ballots discovered, stating that it was not possible to do so, though stating no reason why such impossibility existed.

There is a primary presumption that all ballots cast are legal. No court should be authorized to discard all absentee ballots tendered by over seven hundred legal voters of the county merely upon the general view or general conclusion above stated. That could result in doing too much violence to the individual right to vote, without any effective way to check or to test the general conclusion, for lack of specific findings.

The controlling question in this case is whether the District Judge and the District Court had jurisdiction to follow the procedure and to undertake the actions engaged in by the processes of these civil actions. We agree with the majority opinion that this question must be answered in the negative. Under our Constitution, Art. 5, § 30, the State Senate is the final judge of its own membership, but this appeal must be decided by this Court, and since its determination is governed by State Laws we must follow them.

In support of the majority opinion construction of the applicable laws, it should

be emphasized that this case demonstrates the fact that in the case of primary elections, there is neither time for a full and complete trial of the case in the trial court, (as we observe here), nor time for proper presentation and determination of the cause on appeal, in time to print names on future ballots.

Our attention is drawn to the fact in this case that on account of the orderly processes of court procedure, with due hearings and presentations, and fair consideration, there could not be sufficient time to conclude litigation by next election time, so neither name went on the ballot for lack of any certification from the County Election Board. There was no such certification because the trial court thought it necessary and proper to enjoin and prohibit it by the two orders referred to in the majority opinion. While the orders were both invalid for lack of jurisdiction, they effectively prevented full completion of the recount hearing and prevented any certification or the placing of either name on the ballot.

It should be further pointed out that while the trial court found it impossible to determine the exact number of legal and illegal absentee ballots, perhaps for lack of time in the civil action trial which commenced after the middle of September, yet the number of legal and illegal absentee ballots could have been determined with mathematical certainty in the recount hearing commenced promptly and conducted with dispatch as provided and required by Sec. 391, supra. The sole and avowed purpose of that section is to make that determination with exact mathematical certainty.

Thus, as pointed out in the majority opinion, there was not a lack of remedy to the candidate here, as to the absentee ballots here involved.

The stated general findings of fact by the trial court set up a situation which demonstrates the lack of any need for judicial interference in these civil actions with the recount hearing provided by statute, and in that way such findings offer support for the plan and purpose legislatively intended and offer support for the majority opinion's construction of the statutes.

We cannot check the record and decide for or against evidential support of those findings, since the lack of trial court jurisdiction controls disposition here, but assuming, as the trial court found, that several hundred of these 711 absentee ballots were illegal for the reasons observed and set out by the trial court, then surely the recount hearing would have developed such illegalities.

With the facts as above assumed, it is hardly possible that the Judge and the Election Board working together in the recount hearing could have failed to observe, at least in large part, those same illegalities which the Judge himself observed in the civil action hearings, if the recount hearing had been permitted to continue to its normal conclusion with final decision and certification of result. Substantially less than two hundred illegal votes showing up in the recount hearing among the 711 absentee ballots originally counted would have been sufficient to change the election result from Russell to Payne, and in my view the recount should not have been interfered with by court order, but such hearing should have been allowed to continue to final conclusion and certification of result in the manner planned and provided for by the applicable legislative enactments, to the end of arriving at the fair and true and final election result with dispatch, as contemplated by the law, and as desired by all.

BLACKBIRD, Justice (dissenting).

I cannot agree with the majority opinion. It infers, without quoting directly the allegations of the plaintiff, Plunkett, that said plaintiff based his cause of action, as a qualified voter of Wagoner County, upon the claim that unless the defendant, Wagoner County Election Board, was restrained, or enjoined, from certifying to its previous tabulation of votes for State Senator in the primary election involved; and the evidence of illegal voting heard by the Court; and the votes, found to be il-

legal, decreed to be null and void and prohibited from being counted, then his, and other legal votes, cast for Candidate Payne would be cancelled and nullified by illegal ones cast for Candidate Russell. Plainly his position that his constitutional right, and that of other qualified voters who voted for Payne, to a free and equal election, under Art. III, § 7, of the Oklahoma Constitution was violated—if illegal votes cast for Russell were given equal weight and value with theirs—is not a claim of the "total invalidity" of an election (referred to in the majority's quotation from Garrett v. London, 107 Okl. 72, 229 P. 1074; nor is it the traditional and ordinary basis (or cause of action) for a candidate's proceeding for a recount. Nor is it the usual basis for an action to try title to an office. *Certainly* the constitutional right Plunkett asserts is not one that is peculiar, and exclusive, to him, *but* neither does he claim any interest in the office involved. (As far as his petition shows, he is not an aspirant to any office.) The emphasized portion of my last statement is the crux of the distinction between this case and Garrett v. London, supra, on which the majority relies for its holding (first syllabus) that "A qualified elector * * * is not a proper party plaintiff * * *" in the present action. A reading of the complete opinion in Garrett v. London, supra, will show beyond doubt, that it is not analogous to the present case, either in facts or in principles of law applied therein. The difference in the two cases is briefly indicated by the following excerpts which include that portion out of whose context, the majority's quotation was extracted. At page 74 of 107 Okl., at page 1076 of 229 P., reads in part, as follows:

"* * * it is claimed that a number of qualified voters were illegally *prevented* from casting their ballots; that these electors, if permitted to vote, would have voted for plaintiff; that these votes so offered, would have been sufficient to overcome defendant's majority, and cause plaintiff to have suffi-

cient votes *to entitle him to the nomination.* * * *" (Emphasis ours.)

And at page 76 of 107 Okl., at page 1078 of 229 P., from which the majority's quotation is taken, it is said:

"Here again, the *title to the office* was claimed by the party who began the action. We are cited to no case within this jurisdiction, where *a person not claiming title to the office* or *some peculiar interest therein* has been permitted in his own name to prosecute an action *to oust the encumbent of the office. The statutes giving this right of action were intended to protect the interest of one claiming the office; but it nowhere appears that it was intended that an individual should be substituted [for] the representative of the public at large to prosecute an action claiming the total invalidity of an election.*" (Emphasis ours.)

Nor does the majority opinion's reference to actions in the nature of quo warranto and statutes concerning them, such as Tit. 12 O.S. 1951 §§ 1531 and 1533, relieve it from the fault of *attempting to measure Plunkett's* above-described *cause of action* by rules and statutes *applicable to actions to try title to, or oust persons from, office,* and to proceedings for a *recount by a candidate.* Quo warranto, or an action of that nature, is the proper way to try title to an office when it is being usurped by one not entitled to it. See Matney v. King, 20 Okl. 22, 93 P. 737, 745; Jarman v. Mason, 102 Okl. 278, 229 P. 459. *Of course,* a party claiming no interest in the office has no right to institute, in his own name, an action in the nature of quo warranto: Such an action can only be brought by, or with permission of, the attorney general or county attorney. *But, this action is not of that character.* Therefore, the cases of Cheek v. Eye, 96 Okl. 44, 219 P. 883, and the others immediately following it, in the majority opinion, are not applicable. The "action" in the majority opinion's broad statement of the rule for which it cites these cases *is an action in the nature of quo war-*

*ranto* and *those cases did not purport to make it applicable to injuries, generally,* as the majority statement would infer. The gist and rationale of a substantial part of the majority opinion, when correctly analyzed, is simply that since an individual member of the public has no right to bring an action in the nature of quo warranto in his own name—nor an election 'contest—that by the same token, Plunkett has no right to bring the action he has brought. This is faulty reasoning. The conclusion does not necessarily follow from the major premise. The fact that a private citizen has no peculiar or particular right or interest in the office involved is good reason for holding that he cannot institute an election contest or bring a quo warranto action in his own name. It is *no* reason, however, for holding that he cannot bring the type of action Plunkett has brought He claims no right or title to any office. He merely seeks to enforce his constitutional right to "free and equal" suffrage—a personal right guaranteed him by the Oklahoma Constitution. And he asked for a court inquiry and judgment that would protect his legal vote in the senate race. When such inquiry, or trial, was held, and judgment rendered in the trial court, it had the effect of changing the result of the race for State Senator in Wagoner County—and, as an ultimate consequence, changed the result of that race in the whole district. But that was no concern or object of Plunkett's, as long as the court's judgment preserved to him his right, under Art. III, § 7, supra, and sec. 6, of the Oklahoma Constitution. If, as the trial court determined, Plunkett's vote, and like votes, in the election board's tabulation were allowed to be cancelled by illegal votes, then, under the great weight of precedent from other states having provisions in their Bills, or Declarations, of Rights, or Constitutions, like Art. III, §§ 6 and 7, supra, the right given or reserved to those voters under those provisions was violated in the Wagoner County tabulation. In California, the qualifications of voters are set forth in its Constitution's Art. II, as they are in Art. III, of our Constitution.

In Pierce v. Superior Court, 1 Cal.2d 759, 37 P.2d 453, 456, 460, 96 A.L.R. 1020, in a special opinion by Justice Langdon, it is said:

"The right to vote in this state is granted, and the qualifications of voters are prescribed in our Constitution, article 2, § 1. The status of the voter, if we must call it that, *is established by the constitution,* and *not by legislative enactment.* The legislature has prescribed certain regulations by the registration laws, which must be followed before the voter having the constitutional qualifications can exercise his franchise. But registration is not an element which determines the status of a voter; he may be a qualified voter, though unable to vote in a particular election because improperly registered. [Citing cases.]"

In State ex rel. McGrael v. Phelps, 144 Wis. 1, 128 N.W. 1041, 1046, 35 L.R.A., N.S., 356, the court said:

"So the right to vote is one reserved by the people to members of a class and as so reserved, guaranteed by the declaration of rights and by section 1, art. 3, of the Constitution. It has an element other than that of mere privilege. It is guaranteed both by the Bill of Rights, and the exclusive intrustment of voting power contained in Section 1, art. 3, of the Constitution, and by the fundamentally declared purpose of government; and the express and implied inhibitions of class legislation, as well. Such declared purpose and the declaration of rights, so far as they go, and the equality clauses,—constitute inhibitions of legislative interference by implication, and with quite as much efficiency as would express limitations, as this court has often held. [Citing cases.]

"Thus is given the right to vote a dignity not less than any other of many fundamental rights."

In State v. Staten, 46 Tenn. 233, it was held:

"The elective franchise is a right which the law protects and enforces, as jealously as it does property in chattels or lands. It matters not by what name it is designated—the right to vote, the elective franchise, or privilege of the elective franchise—the person, who, under the Constitution and laws of the State, is entitled to it, has a property in it, which the law maintains and vindicates as vigorously as it does any right of any kind, which men may have and enjoy."

The next question is: Of what does this right, guaranteed by our Constitution, consist? The answer is found in Ladd v. Holmes, 40 Or. 167, 66 P. 714, 91 Am.St. Rep. 457, one of the most cited and followed cases on this subject. There the court said, 66 P. at page 718:

"Article 2, § 1, provides that all elections shall be free and equal. To be free means that a voter shall be left in the untrammeled exercise, whether by civil or military authority, of his right or privilege. * * * The word 'equal' has a different signification. Every elector has the right to have his vote count for all it is *worth,* in proportion to the whole number of qualified electors desiring to exercise their privilege. Now, if persons not legitimately entitled to vote are permitted to do so, the legal voter is denied his adequate, proportionate share of influence, and the result is that the election, as to him, is unequal; that is, he is denied the equal influence to which he is entitled with all other qualified electors. [Citing cases.] So that the term 'free' and 'equal,' used as they are, correlatively, signify that the elections shall not only be open and untrammeled to all persons endowed with the elective franchise, but shall be *closed* to all not in the enjoyment of such privilege under the constitution.". (Emphasis ours.)

See also People ex rel. Lindstrand v. Emmerson, 333 Ill. 606, 165 N.E. 217, 62 A.L.R. 912, and Littlejohn v. People, 52 Colo. 217, 121 P. 159, 161, Ann.Cas.1913D, 610. Among the jurisdictions in which the above-quoted Oregon case has been cited and quoted with approval, is our own. The view that our constitutional guarantee of "free and equal" elections means that no impediment or restraint of any character, either direct or *indirect,* shall be placed upon the voter, obtained the approval of this Court in Richardson v. Gregg, 144 Okl. 102, 290 P. 190, 193, citing Ex parte Wilson, 7 Okl.Cr. 610, 125 P. 739.

Granting, but not conceding, that the principal question involved in the ordinary election contest is a political one, and that the so-called "right" to public office sought to be enforced therein is not such a "property right" as a court of equity will enforce (as the authorities quoted in the majority opinion indicate) the right Plunkett asserted, and the questions affecting it, whose determination he sought in the present action, was not such a right, or question. And, it was no insurmountable obstacle to the trial court's assumption of jurisdiction, that no statute exists specifically authorizing such an action. While it is true that Art. III, § 6, supra, directs that the Legislature, among other things, "make all such other regulations as may be necessary to * * * preserve the purity of the ballot * * *", and said section, in so far as it contemplated that the Legislature enact laws to carry out its provisions, cannot be said to be self-executing, 16 C.J.S., Constitutional Law, § 53, Plunkett's right to have his vote given all the weight and value a legal vote was entitled to, under the "free and equal" provision, sec. 7, supra, is not a right which needs defining by statute to make it enforcible, as plainly shown by the foregoing authorities. It is a fundamental right, guaranteed by the Constitution to all qualified voters; and, as such, needs no statute to define either it, or an injury to it. In addition to the foregoing authorities, see 11 Am.Jur., Constitutional Law, §§ 73–76, inclusive. If said section not be construed as self-executing, then the Legislature, by its non-action, could emasculate it. Ibid, sec. 75. But, the courts in up-

holding causes of action based on said right, have, in effect, held to the contrary. And, said right is just as alive and effectual in a primary election, as when involved in a general election. In the fourth syllabus of Craig v. Bond, 160 Okl. 34, 15 P.2d 1014, 1015, this court reiterated the following syllabus from Dove v. Oglesby, 114 Okl. 144, 244 P. 798:

> "'Under our scheme or plan · for holding elections and exercising the right of suffrage as provided in article 3 of the Constitution, primary elections are made a component element of the right of suffrage. They are made a necessary prerequisite to a general or final election, and the free exercise of the right of suffrage is, just as necessary in primary elections as in general elections, and hence, the provisions in section 7, art. 3 of the Constitution apply in primary elections the same as in general elections.'"

In this connection, see also People ex rel. Breckon v. Board of Election Com'rs of Chicago, 221 Ill. 9, 77 N.E. 321, 323, Ann. Cas. 562. After quoting extensively from Ladd v. Holmes, supra, the Court in the Wilson case, supra, said:

> "The election provisions of the Constitution and the mandatory primary election law were intended for the protection of the party, and of the citizen in his rights as a member of a political party, and guarantee to him the right to express, through his ballot, at a primary election his wish as to the conduct of the affairs of his own party, and his preference in the selection of the candidates for office within his party. *If this was not so, an elector participating in a primary election would be powerless,* and without any method or means of protecting this right conferred upon him by the Constitution and law."

Our Constitution, in its Art. III, § 6, by use of the word "shall" enjoins upon the Legislature the *mandatory duty,* see State ex rel. Ogden v. Hunt, (Okl.) 286 P.2d 1088, of making "all such * * * regulations *as may be necessary* to detect and punish fraud and *preserve the purity* of the ballot; * * *." In its Art. II, § 6, said document says:

> "The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong * * *."

In its Art. VII, § 10, said document invests district courts with "original jurisdiction in *all* cases, civil and criminal, *except* where exclusive jurisdiction is by this Constitution, or by law, conferred on some other *court* * * *". Note that the last cited article and section says "some other court", and does not make the vesting of jurisdiction in an election board, an exception to the matters over which the district courts are therein given jurisdiction. There is nothing about the prescriptions in Art. III, §§ 4, 5, and 6 (describing what the Legislature "shall" do with reference to holding elections) which relieves that body from discharging its duty under the last portion of section 6, supra, to "preserve the purity of the ballot", and to protect qualified electors' right of suffrage in "free and equal" elections, under Art. III, § 7, supra. Nor do the cited portions of Arts. II and III relieve the district courts of our state of the duty enjoined upon them by Art. II, § 6, to afford a remedy for every wrong; or that divests said courts of the *power* to do so, vested in them by Art. VII, § 10, of jurisdiction in *all* cases except those wherein jurisdiction has been "conferred upon some other court * * *". In this connection, I find no fault in the construction placed on § 6, Art. II, supra, by Adams v. Iten Biscuit Co., 63 Okl. 52, 162 P. 938, 942, (cited in the majority) that it is a "mandate to the judiciary and was not intended as a limitation upon the" Legislature. *But that answers no question in this case.* Here, the Legislature, as all must recognize, has not attempted to exceed such "limitation" in any way; unless Tit. 26 O.S.1951 § 391, was intended to encompass, and provide a remedy for, wrongs to private citizens in Plunkett's category, as I say, it was not.

Said section nowhere mentions any "parties in interest" except candidates. If we recognize that Plunkett's cause of action is not the same as that upon which a candidate proceeds for a recount, then no statute has yet been enacted that gives him a remedy for such wrong. *Of course, sec. 6, Art. II, is a mandate to the judiciary;* but it is also self-executing. See Mayes v. Pitchford, 26 Okl. 129, 109 P. 821; State ex rel. Smith v. Brown, 24 Okl. 433, 103 P. 762. And, as I have pointed out, since there is no statute either authorizing or denying such a citizen the right to bring an action like Plunkett instituted, the district court violated no law (as the majority opinion infers) in assuming jurisdiction to try it. Self-executing provisions of the Constitution, such as Art. III, § 7, and Art. II, § 6, supra, of course *do not necessarily exhaust legislative power,* or restrict or prevent the Legislature from acting in the fields they cover.; *but* any legislation enacted in such fields must be capable of being reconciled and harmonized with the Constitution, or *said legislation is unconstitutional.* 11 Am.Jur., sec. 76, supra. The following excerpt from the opinion in the Adams case, supra, is quite revealing as to the view upon which its decision was based. There it was said [63 Okl. 52, 162 P. 942]:

> "Neither do we think it (Art. II, sec. 6) was intended to prevent a particular remedy for given causes of action in certain courts of the state, nor was it intended to deprive the Legislature of the power to abolish remedies for future accruing causes of action (where not otherwise specifically *prohibited),* or to create new remedies for other wrongs as in its wisdom it might determine."

I can agree with that view, but I say that if, by sec. 391, supra, the Legislature intended to give anyone a remedy for a wrong such as Plunkett asserted in this case, then such remedy must be complete, and include the right to a judicial review, or it takes from such a complainant thereunder, a constitutional right which is "otherwise prohibited", i. e., by the due process clause of

the Oklahoma Constitution, Art. II, § 7. In this connection see State v. Staten, and, 18 Am.Jur., Sec. 44, supra. The Workmen's Compensation Act, 85 O.S.1951 § 1 et seq., dealt with in the Adams case, supra, did not purport to prevent judicial review of awards thereunder. On the contrary, it specifically provided for such review, as it *had* to, in order to afford due process. *The majority opinion does not deal with this unconstitutional feature of sec. 391,* supra, *and* consequently *renders no decision upon one of the prime issues presented* by this appeal. It merely calls it "a comprehensive plan for a recount hearing * * *". The trial court held that in so far as, by its prohibition against court review of the Election Board's decision, said section purports to deprive the courts of jurisdiction to protect a qualified voter's rights under the " 'free and equal election' " provision of the Constitution, said statute is void and unconstitutional. He was correct. He was aware that under this court's opinion in Brickell v. State Election Board, mentioned in the majority opinion, the Wagoner County Election Board, in arriving at the decision it reached in the recount, could not determine—and it had not determined —"such questions as * * * illegal voting * * *". After discovering that Sec. 391, supra, affords no protection for such right of qualified voters who had cast legal ballots as against other ballots, which were *apparently* legal, but were *in fact* illegal, the trial judge concluded that this being so, the plaintiffs could invoke the jurisdiction of a district court possessing equitable power to give them relief under the constitutional mandate that "courts of justice" shall afford "speedy and certain remedy * * * for every wrong" Art. II, § 6, supra, and, under Art. VII, § 10, supra, investing district courts with "original jurisdiction in *all* cases, civil and criminal, except where exclusive jurisdiction is by this Constitution, or by law, conferred upon some other *court* * * *". The trial judge thereupon recognized, and gave effect to, one of the commonest grounds upon which the courts have exercised jurisdiction

of cases involving elections, namely, the complainants' *lack of an adequate remedy at law*. (See the cases cited and digested in the Annotations at 1 A.L.R.2d 588). He recognized that, by enacting sec. 391, supra, *the Legislature had not effectively complied with the mandate the Constitution gave it by Art. III, § 6*. This court recognized, at least as early as Looney v. County Election Board, 145 Okl. 25, 291 P. 554 (10th syl.) that where the original decision in an election contest is *"judicial" in nature*, it *must* be subject to *"court supervision"*, or *judicial review*. Consequently, if the Wagoner County Election Board *had* purported to determine the judicial question of which of the absentee ballots, valid on their face, had not been executed as specified by the Absentee Ballot Law, and therefore were not entitled to be counted—*(which said Board did not purport to determine)*—then its decision would of necessity have been subject to judicial review, in dependent of sec. 391, and notwithstanding said section's unconstitutional provisions prohibiting such review.

In its statement of the facts, the majority opinion purports to describe certain findings of the trial court with reference to the manner in which the absentee ballots, and the affidavits therefor, were executed and cast and filled out; and it mentions said court's finding that there was no fraudulent conspiracy to secure illegal votes. These are matters correctly pertaining *only to the merits of the case, and have no place in an opinion on the preliminary question of the trial court's jurisdiction to try the case*. However, since the majority opinion mentions them, I think it appropriate to set forth just what the trial court's findings were, on these matters. I therefore quote them verbatim as follows:

"IX.

"Several hundred of the absentee ballots cast in Wagoner County, Oklahoma, in the Senatorial Run-Off Primary election of July 24, 1956, were cast under onr or more of the following circumstances:

"1. Application was not made by the elector either in person or by mail to the Secretary of the County Election Board, or done so by an agent authorized by law.

"2. Persons voted by absentee ballot who were not absent from the County and Election precinct where they reside on election day, and who had no intention of being so absent at the time the application was made, and who were not suffering from any sickness or physical disability.

"3. Persons voted absentee ballots for a variety of reasons of personal convenience such as, "busy plowing," "fishing", "no baby sitter", "wished to avoid the hot sun", "went to another part of the county to work for a candidate on election day", "had sick people at home they couldn't leave", or voted "because spouse was away and voted absentee."

"4. Persons who were incapacitated by sickness or physical disability were issued absentee ballots well in advance of the date of the election, without designating an agent in writing to procure the same election day.

"5. The absentee elector did not make and subscribe to an affidavit before any notary public or officer or person authorized to administer oaths.

"6. The absentee elector cast a ballot not only for himself but for other members of the family.

"7. Some person other than the absentee elector either marked the ballot or signed the affidavit, or the elector handed his ballot to an agent unsealed.

"X.

"There were more than enough absentee ballots cast without complying with the statutory requirements to change the result of the Senatorial Run-Off Primary Election of July 24, 1956, between the Plaintiff and Intervenor, but it is not possible to deter-

mine with mat*h*matical certainty the number of ballots so cast.

## "XI.

"The evidence shows a concerted campaign on the part of numbers of persons interested in the re-election of Senator John W. Russell to secure absentee ballots in his behalf. The weight of the evidence does not indicate that these persons were conspiring to secure fraudulent or illegal votes by corrupt or illegal methods, *but it is equally clear that* ignorance, carelessness, and *a desire to get as many as possible,* for their candidate, *caused them to violate in wholesale fashion the provisions of the Oklahoma Statutes.* Among both agents who supplied applications and voters who voted absentee ballots personal convenience was the only test of the right to cast such ballots." (Emphasis ours.)

Among the trial court's conclusions of law was the following:

"When there are widespread and flagrant violations of the mandatory provisions of the absentee balloting laws on the part of hundreds of voters in a run-off primary election, and the ballots so cast are illegal ballots and *it is not* possible to accurately separate the legal from the illegal and determine within any narrow margin the true vote for each candidate, the Court may reject the ballot returns from the entire absentee ballot box and should do so." (Emphasis ours.)

The majority opinion does not discuss the validity of such a conclusion in the present case, under the rule dealt with in the Annotations at 155 A.L.R. 677, at pages 682, et seq.; and, of course, that is not called for, if the trial court had no jurisdiction of the case.

However, I think said court did have jurisdiction. In my opinion, the Legislature, by its enactment of Tit. 26 O.S.1951 § 391, has not purported to pre-empt (to the exclusion of the prerogative and duty of courts under Art. II, § 6, supra) the field of affording relief for the violation of the fundamental right guaranteed qualified voters by our Constitution to "free and equal" suffrage, as distinguished from "political rights" such as holding office, or of ousting others therefrom. It would consequently follow that the plaintiffs here-in, as such voters, had no adequate remedy at law, or by statute; and were entitled to invoke the equitable powers of the district court to provide them one. If, however, said election recount law be interpreted as such a pre-emption, and as prescribing such a voter's *exclusive* remedy for the violation of such a right—then, as the trial court held—it is null, void and unconstitutional. Thus, under either view, i. e. (1) if sec. 391 did not provide plaintiffs a remedy; or (2) if it should be ignored as a nullity for providing them only an *incomplete* one, *without the right of judicial review* therein prohibited, and was therefore unconstitutional under the due process clause—the trial court correctly assumed jurisdiction of this case.

"The general rule is that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void, and in legal contemplation is as inoperative as if it had never been passed. It imposes no duties, confers no rights, bestows no power or authority on anyone, affords no protection and justifies no acts performed under it."—Town of Medford ex rel. Fuss v. Early, 194 Okl. 566, 153 P.2d 633, 634.

I think the majority opinion should have affirmed the trial court's jurisdiction, and then (and *only* then), it would have been proper and just to have considered the record, and the substantive law applicable to the evidence, and to have determined therein whether the trial court had adjudged this case correctly on its merits.

In his "specially concurring" opinion, Justice Williams says he believes Payne "was entitled in his recount proceedings to assert the alleged illegality of certain

absentee ballots, notwithstanding the decision of this court in" the Brickell case. This individual view is the only apparent basis for said opinion's preceding representation that: "Plaintiff Payne apparently abandoned his remedy under that provision of law * * *". If, by the indefinite term "certain absentee ballots", Justice Williams is referring to the absentee ballots that appeared on their face to be valid, but were not (under the provisions of the Absentee Ballot Law) then his statement concerns a matter which Payne, as well as the Wagoner County Election Board, *knew could not* be inquired into under the unequivocal statement of our views on the subject in the Brickell case. And, I reiterate that the Wagoner County Election Board did not attempt to inquire into, or rule upon, the validity of those ballots. If the majority of this court is now of the opinion that, under the proper interpretation of Section 391, supra, the Election Board could, and should, have received evidence and ruled upon such matters, then it should overrule the incorrect pronouncement made in the Brickell case, and clarify "the extent and scope" of such recounts which, the majority opinion expressly, and the Williams' opinion tacitly admit "is not entirely clear * * *".

If there had occurred in this case, what Justice Williams says *could have* occurred, and, after the Election Board's decision, Payne, as suggested by Justice Williams, had applied to this court for the "proper writ", then he would have been confronted (as he was in this case) by Section 391's unconstitutional prohibition against court review. This points up the unreal position, revealed in both the majority opinion and the Williams' opinion, that the constitutionality of said section is not an issue in this case. As hereinbefore mentioned, the trial court specifically held that in so far as said section purported to provide plaintiffs a remedy, to the exclusion of court jurisdiction, it was unconstitutional and void. How can this court correctly reverse said judgment and determine that said section *did* provide them a remedy, despite its provision

excluding court review, without determining the constitutionality of said provision? To state the question, is to answer it—in the negative! I have hereinbefore shown that said section *is unconstitutional. Neither the majority, nor any of the specially concurring opinions, directly question or answer, what I have said about its unconstitutionality.* They merely say that that is not an issue, or that said section furnishes a remedy.

It is obvious from an examination of the other special concurring opinions filed in this case, that certain matters referred to therein, other than those I have mentioned, if pertinent at all, would be so, only upon consideration of the case on its merits. Nothing said therein gives the majority opinion any support of substance on the question of jurisdiction. The "time element", or considerations of expediency, furnish no valid ground for denying litigants' fundamental rights. See State ex rel. McGrael v. Phelps, supra. As the majority opinion undertakes no decision on the merits of the case, the individual views expressed in the "concurring" opinions, warrant no further attention.

In accord with the views herein expressed, I dissent.

HALLEY, Justice (dissenting).

I concur in the views expressed by Mr. Justice Blackbird and only wish to add a word to what has been said by him. The majority opinion confesses weakness that does not exist under our Constitution. In my opinion the evidence is overwhelming, and the trial court found, that there were enough illegal absentee votes cast in Wagoner County to change the result of the primary election and when voided Payne would have had a majority. No Legislature has the right to take away from this Court the right to correct wrongs when they occur regardless of the area of the life in which they may arise. We are clothed with the power under our Constitution to see that all elections are conducted fairly. I dissent.