2002 OK 59

Chad D. ALEXANDER, A. Marshall Snipes, Judith Pratt, Currie Ballard, Carolyn McLarty, Audrey L. Ewing, Don O'Nesky and Frank Keating, in his official capacity as Governor of the State of Oklahoma, Plaintiffs–Appellees,

Steve Edwards and Colby Schwartz, Intervenors/Plaintiffs– Appellees,

v.

Stratton TAYLOR, in his official capacity as President Pro Tempore of the Oklahoma State Senate, and Larry E. Adair, in his official capacity as Speaker of the House of Representatives of the State of Oklahoma, Defendants–Appellants,

Richard Allen, Roosevelt Milton, Greg Robinson and Joel Porter, Intervenors/Defendants–Appellants.

No. 97,836.

Supreme Court of Oklahoma.

June 25, 2002.

As Corrected June 27, 2002.

**1206**

Fred A. Leibrock, William S. "Bill" Price, B. Kay Carel, Phillips, McFall, McCaffrey, McVay & Murrah, Oklahoma City, OK, Efrem Mark Braden, Baker & Hostetler, Washington, D.C., for Plaintiffs–Appellees, Chad D. Alexander, A. Marshall Snipes, Judith Pratt, Currie Ballard, Carolyn McLarty, Audrey L. Ewing, and Don O'Nesky.

Kristye Kirk–Shores, Judy Terry, Office of the Governor, and Mike Hunter, Office of the Secretary of State, Oklahoma City, OK, for Plaintiff–Appellee, Frank Keating in his official capacity as Governor of the State of Oklahoma.

Andrew W. Lester, Lester, Loving & Davies, P.C., Edmond, OK, for Intervenors/Plaintiffs–Appellees, Steve Edwards and Colby Schwartz.

Don G. Holladay, Holladay, Chilton & DeGuisti, Oklahoma City, OK, for Defendants–Appellants.

Lee Slater, Oklahoma City, OK, for Defendant–Appellant, Stratton Taylor.

Heidi J. Long, Holladay, Chilton & DeGuisti, Oklahoma City, OK, Thomas J. Perrelli, Jenner & Block, for Defendant–Appellant, Larry E. Adair.

Ronald "Skip" Kelly, Oklahoma City, OK, for Intervenors/Defendants–Appellants, Richard Allen, Roosevelt Milton, Greg Robinson, and Joel Porter.

## OPINION

WATT, Vice Chief Justice.

### FACTS AND PROCEDURAL BACKGROUND

¶ 1 Plaintiffs–Appellees, as residents and registered voters of the State of Oklahoma, filed their petition in this case, seeking injunctive relief to ensure compliance with the federal laws governing congressional elections in the State of Oklahoma as a result of the 2000 Decennial Census. The petition was amended to request the additional relief of a declaration that The Oklahoma Congressional Redistricting Act of 1991, 14 O.S. § 5.1 et seq., is unconstitutional. Appellees alleged it was determined by the 2000 Census that the number of Congressional districts in Oklahoma must be reduced from six to five because Oklahoma's population had failed to grow as fast as that of many other states since the 1990 Decennial Census. The 2000 census revealed that Oklahoma's population as a percentage of the nation's entire population decreased from what it had been under the 1990 census. Defendants–Appellants were sued in their official capacities.[1]

¶ 2 Appellees alleged in their amended petition, filed February 21, 2002, that the Oklahoma Legislature had not yet adopted a redistricting plan and that the qualifying deadline for candidacy for the United States House of Representatives was July 10, 2002. They alleged that unless the Legislature adopted a redistricting plan in time for it to be implemented before the July 10, 2002 deadline, "the interests and rights of Plaintiffs and all Oklahoma voters in the enforcement of applicable election laws will be further compromised, and their rights under federal and Oklahoma law to participate in the congressional election process in a timely and equal manner will be further violated."

---

1. Governor Frank Keating was sued in his official capacity as Governor of the State of Oklahoma. The parties were later realigned, and Governor Keating became a plaintiff. Glo Henley, Kenneth Monroe and Thomas E. Prince were sued in their official capacities as Members of the State Election Board and were dismissed without prejudice.

¶ 3 As the basis of their request for relief, Appellees cited Art. 1, § 2 of the United States Constitution, as amended by the Fourteenth Amendment, § 2, which provides, in part, "the House of Representatives shall be composed of members chosen every second year by the people of the several states" and that "representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state . . . ." Appellees requested that the court ensure enforcement of the laws and adopt and implement a congressional redistricting plan to be in place in sufficient time for the candidate qualification and election process to go forward according to the schedule established by Oklahoma law.

¶ 4 Appellants Stratton Taylor and Larry E. Adair filed a Motion to Stay Redistricting Proceedings, pending the earlier of (1) enactment by the Oklahoma Legislature of a new congressional redistricting plan; (2) the Legislature's May 24, 2002 *sine die* adjournment date; or (3) unanimous agreement among the parties that legislative enactment of a new redistricting plan was not reasonably anticipated to occur by the *sine die* adjournment date. Appellees objected to the stay. The trial court overruled the motion to stay, and the case proceeded to trial.

¶ 5 Five redistricting plans were submitted to the court. They are identified as follows:

1. Governor's, or Continuity, Plan, submitted by Appellees;

2. Senate Plan, submitted by Appellants;

3. Conference Committee Plan, submitted by Defendants and Defendants/Intervenors;

4. House Plan # 3, submitted by Defendants and Defendants/Intervenors; and

5. Edwards–Intervenors' Plan

¶ 6 Following a five-day, non-jury trial, the court filed its judgment on May 31, 2002, establishing the Governor's Plan as the Congressional redistricting plan to be implemented for the State of Oklahoma. On June 5, 2002, a three-judge panel of the United States District Court for the Western District of Oklahoma entered an order in a pending case involving the same issues as those before us today. The federal court denied the motion of Defendants–Intervenors, Larry E. Adair and Stratton Taylor, to declare that the congressional redistricting plan implemented by the Oklahoma County District Court was void. The federal court's order also stayed further proceedings there until the conclusion of the appeal process in this Court. Appellants filed their petition in error in this Court on June 7, 2002 and we granted Appellants' motion to retain this appeal on June 12, 2002.

DISCUSSION

I.

THE OKLAHOMA COURTS HAVE JURISDICTION OVER THE ISSUES PRESENTED BY THIS APPEAL

■ ¶ 7 Appellants argue that because of this Court's opinion in *Jones v. Freeman,* 1943 OK 322, 146 P.2d 564 and its progeny, we should hold that Oklahoma courts are without jurisdiction to decide this matter.[2] Appellants also rely on *Smith v. Clark,* 189 F.Supp.2d 503 (D.C.S.D.Miss.2002), *prob. juris. sub nom., Branch v. Smith,* —— U.S. ——, 122 S.Ct. 2355, 153 L.Ed.2d 178 (2002), in support of the proposition that Art. 1, § 4 of the United States Constitution deprives state courts of jurisdiction to consider congressional redistricting disputes. For the reasons stated below, we disagree with Ap-

---

2. After its decision in *Jones v. Freeman* this court declined to act in other cases arising from election laws. See, *Wagoner County Election Board v. Plunkett,* 1956 OK 329, 305 P.2d 525 (held: Oklahoma courts lacked jurisdiction to grant relief despite clear showing of fraudulent absentee ballots in sufficient numbers to change the result of an election); *Brown v. State Election Board,* 1962 OK 36, 369 P.2d 140 (held: Supreme Court lacked jurisdiction to reapportion legislature despite clear unconstitutionality of the current leg-

islative apportionment laws); and *Davis v. McCarty,* 1964 OK 5, 388 P.2d 480 (held: reapportionment act would be modified with respect to state senate but not with respect to house, although federal constitutional "One person, one vote" requirement remained unsatisfied). Because of this Court's failure to reapportion the state legislature in *Davis v. McCarty,* a three judge federal district court, relying on *Baker v. Carr,* did so in *Reynolds v. State Election Board,* 233 F.Supp. 323 (D.C.W.D Okla.1964).

pellants' analysis and hold that the courts of the State of Oklahoma have jurisdiction to hear and decide this matter.

¶ 8 If we fail to act here, the obvious effect will be that the three judge federal district court that has been empaneled to consider the problem created by the failure of the legislature to agree on redistricting legislation will set new congressional districts in our stead. The parties agree that this will likely be the case. We deem such an outcome unsatisfactory based on both state law and the teachings of the United States Supreme Court.

¶ 9 No specific Oklahoma constitutional or statutory provision provides a procedural blueprint for how the trial court was to handle the issues presented to it here. Nevertheless, we hold that the trial court correctly assumed both that it had jurisdiction and that a justiciable controversy was presented because of Okla. Const., Art. 2, § 6, which provides:

> The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice.

Given the unsatisfactory alternative to Oklahoma courts hearing and deciding this case, we have reexamined our jurisprudence addressing our jurisdiction in such matters and now hold that the trial court had subject matter jurisdiction and a justiciable case or controversy was presented. Further, after carefully reviewing the record, we find that the trial court's judgment was not clearly contrary to the weight of the evidence, is entitled to a presumption of correctness, and must, therefore, be affirmed.

¶ 10 In *Smith v. Clark*, which Appellants strongly rely on, a three judge federal district court in Mississippi enjoined the state courts from proceeding with carrying out the creation of new congressional districts. The court made clear that it was doing so for two reasons, neither of which is present here. First, it was unclear whether the state courts could have a redistricting plan in place in time for congressional elections because of the necessity of having any such plan pre-approved under the Voting Rights Act, 42 U.S.C. § 1973c. No such problem exists here as the parties agree that no minority rights would be endangered if the court adopted either of the plans at issue, which the parties agree are the plan passed by the Oklahoma State Senate and the plan proposed by the Governor. Second, the Mississippi court made clear that there was at least a possibility that the Mississippi legislature might reapportion itself in time to provide for congressional elections. Here, by contrast, the legislature could not agree on a plan for two years and, in any case, has adjourned *sine die,* leaving no time for legislative action before the filing period for congressional offices begins in a matter of days. In any event, to the extent *Smith v. Clark* can be interpreted to stand for the proposition that state courts have no power to act in redistricting disputes because Art. 1, § 4, of the United States Constitution,[3] prohibits state courts from acting, we decline to follow it. It is clear to us that *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and *Growe v. Emison,* 507 U.S. 25, 34, 113 S.Ct. 1075 1081, 122 L.Ed.2d 388 (1993), both discussed at some length later in this section, stand for the proposition that Art. 1, § 4 does not prevent either federal or state courts from resolving redistricting disputes in a proper case.

¶ 11 In *Jones v. Freeman,* 1943 OK 322, 146 P.2d 564, we declined to reapportion the Oklahoma Legislature despite the fact that the legislature was extremely mal-apportioned. The Court said, "The inequality is so glaring that it repels any presumption that the legislation constituted a fair approximation of what was required by the fundamental law. It represents an instance where fair-minded men can entertain no doubt that the inequality of representation is grave, un-

---

**3.** Article 1. § 4 of the federal constitution provides in material part as follows:

The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof; but the Congress may at any time by law make or alter such regulations, except as to the places of choosing Senators.

reasonable, and unnecessary." 1943 OK 322 at ¶ 11, 146 P.2d at 569 (quoting with approval, from *Stiglitz v. Schardien*, 239 Ky. 799, 40 S.W.2d 315, 321 (1931)). Nevertheless, this Court held in *Jones* that it lacked jurisdiction to "make the reapportionment ourselves, since that duty is legislative in nature. . . ." To the extent that it is contrary to our holding today, *Jones* is expressly overruled.

¶ 12 In *Wagoner County Election Board v. Plunkett*, 1956 OK 329, 305 P.2d 525, we refused to assume jurisdiction under Okla. Const Art 2, § 6 to correct the result of an election that had turned on fraudulent absentee ballots because the election laws provided a recount procedure. The dissents in *Plunkett*, however, took the position that no legislation could be construed to · take away a court's duty under Art. 2, § 6 "to correct wrongs when they occur regardless of the area of the life in which they may arise." We agree with the *Plunkett* dissents and expressly overrule the *Plunkett* majority opinion on this score.

¶ 13 At the time *Jones* was decided, many state courts (and federal courts, too) took the position that reapportionment and congressional redistricting were strictly legislative "political matters," beyond the power of the courts to revise or correct, regardless of the constitutional problems created by a legislature's failure to act. In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the court changed all this and made clear that reapportionment is not a strictly legislative enterprise. There, a three judge federal district court in Tennessee had held that it lacked subject matter jurisdiction and that no justiciable claim had ·been stated in an action brought to require the reapportionment of the Tennessee legislature, which had failed to reapportion itself since 1901. The United States Supreme Court reversed the three judge district court's dismissal and held that the plaintiffs, who had sued on behalf of all Tennessee voters, stated a cause of action based on the denial of equal protection of the law and directed the three judge district court to hear and decide the case.

¶ 14 In retrospect, the reason the court felt it necessary to so profoundly change the law in *Baker v. Carr* is clear. Many state legisla-

tures, including the Oklahoma legislature, had ·routinely refused to reapportion themselves, and many state courts, including this Court, routinely ruled that they were powerless to do anything about it. Thus, something had to be done and was done in *Baker v. Carr*. The court in *Baker v. Carr* also recognized that courts have jurisdiction in congressional redistricting matters under Art. 1, § 4 of the federal constitution, pointing out, "The first cases involved the redistricting of states [under Art. 1, § 4]." 369 U.S. at 201, 82 S.Ct. at 701.

¶ 15 There is now no doubt that both state and federal courts have jurisdiction to craft both legislative reapportionment and congressional redistricting plans when, as here, the legislature has failed to act. In *Growe v. Emison*, 507 U.S. 25, 34, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993) the court stressed that *both* state legislatures and state courts are appropriate "agents of apportionment." The court went on to explain that the responsibility was primarily one for the states when it said,

> The primacy of the State in designing [Congressional] districts compels a federal court to defer [to state action in drafting a redistricting plan] where the State through its legislative *or* judicial branch, has begun that highly political task itself.

[Emphasis as in the original, bracketed material added for clarification.] 507 U.S. at 35 and 33, 113 S.Ct. at 1081 and 1080.

¶ 16 The teaching of *Emison* and *Baker* is that citizens have a right to have their legislature properly apportioned and their congressional districts properly drawn and the responsibility for seeing that this right is enforced rests with the states, not the federal courts. ·The failure of a legislature to act is a violation of the state's citizens' constitutional rights under Art. 1, § 2 and the 14th Amendment to the U.S. Constitution. Such a failure is subject to redress by the state court if it will act and only by the federal court if it will not.

¶ 17 Given the profound changes brought about in the law by *Baker*, *Emison*, and other cases, this Court can no longer afford the luxury of declining to act in matters such

as the one before us today on the ground that such decisions are exclusively vested in the legislature. It is now clear that Art. 1, § 2 and the 14th Amendment to the federal constitution provide a right to citizens of this state to seek redress from the Oklahoma courts when the legislature fails to create new congressional districts consistent with constitutional requirements and that if this Court does not grant the relief sought, the federal courts will do it for us. For these reasons, we expressly overrule *Jones v. Freeman, Wagoner County Election Board v. Plunkett, Brown v. State Election Board, Davis v. McCarty,* and any other of our opinions to the extent that they might be construed to stand for the proposition that the courts of Oklahoma should decline to act when the legislature or another state entity fails to draw congressional districts that are consistent with the requirements of Art. 1, § 2 and the 14th Amendment to the constitution of the United States.

¶ 18 Appellants cite *Cook v. Gralike,* 531 U.S. 510, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001), (quoting *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995)); *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000); *Smiley v. Holm,* 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932); and *Davis v. Hildebrant,* 241 U.S. 565, 36 S.Ct. 708, 60 L.Ed. 1172 (1916) in support of their claim that the trial court lacked subject matter jurisdiction here. None of these opinions apply here. *U.S. Term Limits* involved the constitutionality of state enactments that purported to limit the terms of United States Congressmen and Senators and *Bush v. Gore* arose from the hotly contested Florida election recount of the ballots in the 2000 presidential election. *Smiley* and *Hildebrant* were decided in 1932 and 1916, respectively, long before either *Baker v. Carr* or *Emison.* We see nothing in any of these opinions that supports Appellants' contention that state courts are constitutionally prohibited from granting relief for mal-formed congressional districts when their state legislatures have failed to do so.

¶ 19 Appellant also contends that the State Election Board is an indispensable party to this action, whose absence deprives this Court of subject matter jurisdiction. We disagree. Appellees dismissed the State Election Board. Appellants filed a motion to dismiss in favor of the proceedings in federal court, after the deadline passed for re-joining the State Election Board as a party, raising its indispensable party argument for the first time. Appellants cannot now allege as error a situation they helped to create. See *Aronson v. Aronson,* 1970 OK 74, 468 P.2d 493. Moreover, the record reveals the Board is willing to implement whatever lawful redistricting plan is given to it for implementation. Appellants cannot show they were prejudiced by the Board's absence as a party. Thus, we reject Appellants' contention that the absence as a party of the State Election Board deprived the trial court of subject matter jurisdiction.

¶ 20 We hold that the trial court had subject matter jurisdiction over the issues presented to it and that a justiciable controversy was presented, which the court had the obligation to resolve under Okla. Const. Art. 2, § 6. The trial court, therefore, committed no error in so holding.

## II.

### STANDARD OF REVIEW

¶ 21 We stated the standard of review that applies in equitable actions in *Merrill v. Oklahoma Tax Commission,* 1992 OK 53 ¶ 7, 831 P.2d 634, 640–41:

Because when the trial court ... was sitting in equity, *the standard of review applicable to the ruling is whether it is clearly contrary to the weight of the evidence.* While in a chancery case an appellate court may weigh the evidence, it will neither disturb the trial court's findings nor its decree unless the chancellor's decision fails to pass muster under this well-known standard of review. Absent the standard's breach, the appellate court must indulge in the presumption that the decree is correct.

[Emphasis as in the original, footnotes omitted.] In *Robison v. Graham,* 1990 OK 93 ¶ 30, 799 P.2d 610, 618 we vacated a Court of Appeals opinion and reinstated the trial

court's judgment in an equitable action because "the trial court's ruling was not against the clear weight of the evidence." Thus, unless the trial court's judgment here is clearly contrary to the weight of the evidence we must indulge the presumption that the trial court was correct. For the reasons stated in Part III of this opinion, we hold that the trial court's judgment was not contrary to the clear weight of the evidence and is entitled to the presumption that it was rightly decided.

## III.

## THE RECORD SUPPORTS THE TRIAL COURT'S JUDGMENT CHOOSING THE GOVERNOR'S PLAN OVER THE SENATE PLAN

¶ 22 While the Legislature has the power and duty to draw the State's congressional redistricting plan, the court's role in this process is limited to determining whether there are constitutional or statutory defects. *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725(1982). All parties have stipulated in the instant case that all the submitted plans satisfy the constitutional requirement of "one person, one vote" under Art. 1, § 2, U.S. Constitution, see *Abrams v. Johnson*, 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997), and that there are no issues with regard to statutory violations under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Therefore, this Court must determine whether the district court's judgment in its selection of the "Governor's Plan," also called the "Continuity Plan," is a plan that continues the policies of Oklahoma as expressed in its previous redistricting plans. See *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973).

¶ 23 A court, as a general rule, should be guided by the legislative policies underlying the existing plan. The starting point for analysis, therefore, is the 1991 Plan. See *Abrams v. Johnson*, 521 U.S. at 79, 117 S.Ct. 1925; *White v. Weiser*, 412 U.S. at 795, 93 S.Ct. 2348. Widely recognized "neutral redistricting criteria" may be considered. See *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983); *Johnson*

*v. Miller*, 922 F.Supp. 1556 (S.D.Ga.1995), *aff'd sub nom Abrams v. Johnson*, supra. Included among these criteria are: (1) preserving cores of existing districts, or communities of interest; (2) providing geographically compact districts; (3) minimizing splitting of political subdivisions; (4) maintaining historical placement of district lines; (5) fairness to voters; and (6) avoiding contests between incumbents running for reelection.

¶ 24 A major dispute between Appellants and Appellees is the treatment of incumbents in the two major proposed plans, the Senate Plan and the Governor's Plan. Appellees contend that avoiding contests between incumbents is a legitimate objective of the redistricting process, citing *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983); *Jordan v. Winter*, 604 F.Supp. 807 (N.D.Miss.1984). It was held in *Karcher*, 462 U.S. at 740, 103 S.Ct. 2653, that the legislative policy of avoiding contests between incumbents was included among legitimate objectives, which "on a proper showing could justify minor population deviations." See also *White v. Weiser*, 412 U.S. at 797, 93 S.Ct. 2348, "The fact that district boundaries may have been drawn in a way that minimizes the number of contests between present incumbents does not in and of itself establish invidiousness." [Citations omitted.]

¶ 25 Appellants, however, cite cases holding that protection of incumbents should be subordinated after other criteria have been considered. See, e.g., *Wyche v. Madison Parish Police Jury*, 769 F.2d 265, 268 (5th Cir.1985). They also contend error was committed because the trial court's starting point in consideration of legislative criteria was protection of incumbents. Appellees respond that this contention is not supported by the record. The statement in the judgment with which Appellants take issue is the reference to principles to be applied, including, "what are called neutral principles, looking to the last clear expression of state policy in not only the current plan *but in results of previous elections.*" [Emphasis added,] This statement does not imply that the court's major focus was election results because it also included consideration of the 1991 Legislative Plan and the neutral redistricting crite-

ria. Moreover, evidence was presented to the trial court that the 1991 Plan drew districts in which incumbent representatives were not paired against each other. Compare this to the Senate Plan, in which Representative Istook is paired against Rep. Lucas and Rep. Watkins in District 5, an alleged attempt to remove Rep. Istook through political gerrymandering.

¶ 26 None of the proposed legislative plans is perfect. The task before this Court is to determine whether the trial court chose a plan which is constitutional, complies with the statutory requirements of the Voting Rights Act, and adheres to the legislative policy of the State under the previous plan. Despite the fact five plans were proposed, the parties have narrowed the focus to consideration of: (1) the Governor's Plan, also termed the Continuity Plan, proposed by Appellees, and (2) the Senate Plan, proposed by Appellants.

¶ 27 Evidence was presented that each plan has a single district that deviates from the ideal of 690,131 by only one person, and thus maintains population equality. Additionally, evidence was presented that both plans split only four counties, less than any other plan, including the 1991 Plan. The fourth split county in the Senate Plan arises for the sole purpose of moving 83 people from one district to another to achieve the federal constitutional requirement of equal population among the districts. Oklahoma County is divided into at least two districts under both plans. The Senate Plan splits 21 municipalities; the Governor's Plan splits 15 municipalities. Tulsa is included under one congressional district under the Governor's Plan, but the Senate Plan separates North Tulsa from the rest of the City. Tulsa's Mayor LaFortune testified it is not in Tulsa's interest to split it into separate districts. Mayor Kirk Humphreys of Oklahoma City testified in favor of the Governor's Plan because it retains core historical districts and does not put the metro areas in largely rural districts. Beverly Hodges, Oklahoma County Commissioner, testified that the Governor's Plan unites Oklahoma City under a single leader in District 5. She also supports the Governor's Plan, in that Oklahoma, Pot-

tawatomie and Seminole Counties in District 5 have common economic interests and are contiguous. All of the proposed plans create two districts with the majority of the population from rural areas, and three districts, which are predominantly suburban and urban.

¶ 28 As to fairness to voters, evidence was received from the parties' experts Gaddie and Copeland who agree that competitive districts are essential to a healthy representative democracy. "Competitive districts," according to Copeland, are "responsive," that is, they allow for the ability of voters to express changed opinions. When voter preferences change, it is more likely their representation will change. Gaddie and Copeland also agree that the Senate Plan is the most responsive plan, with two competitive seats. In the Governor's Plan, there are four safe Republican seats and only one competitive seat, which is the district that currently elects a Democrat, according to Gaddie. Copeland opined that one seat in the Governor's Plan is just barely competitive, and if an incumbent Republican runs for this seat, it will result in a 4 to 1 Republican congressional delegation. As stated above, however, under the 1991 Plan, the 2000 results favored Republicans 5 to 1.

¶ 29 Both proposed plans have merit, and both have faults. When all factors are considered, the record supports the trial court's decision to choose the Governor's Plan as more nearly continuing the legislative policies of the 1991 Plan than the Senate Plan. Thus, the trial court committed no error in doing so. Although Appellants urge us to substitute the Senate Plan for the Governor's Plan, the standard of review applicable here prohibits such a result. As the trial court's judgment is not clearly contrary to the weight of the evidence, it is entitled to a presumption of correctness and must be affirmed.

### CONCLUSION

¶ 30 The trial court had jurisdiction to hear and rule on the issues in this case under Okla. Const. Art. 2, § 6. Our earlier opinions, such as *Jones v. Freeman*, 1943 OK 322, 146 P.2d 564; *Wagoner County Election*

*Board v. Plunkett,* 1956 OK 329, 305 P.2d 525; *Brown v. State Election Board,* 1962 OK 36, 369 P.2d 140; *Davis v. McCarty,* 1964 OK 5, 388 P.2d 480; and any other opinions reaching the same conclusions, are expressly overruled to the extent that they held the Oklahoma courts must decline to hear cases and grant remedies for violations of congressional redistricting disputes under Art. 1, § 2 and the 14th Amendment to the United States Constitution. This result is necessitated by *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and *Growe v. Emison,* 507 U.S. 25, 34, 113 S.Ct. 1075 1081, 122 L.Ed.2d 388 (1993).

¶ 31 The absence of the State Election Board as a party to this suit did not deprive the trial court of subject matter jurisdiction as Appellants failed to raise it until it was too late to re-join the election board as a party to the suit. In any event, it is undisputed that the Election Board will act in accordance with the orders of this Court.

¶ 32 The trial court's judgment is entitled to a presumption of correctness unless it is "clearly contrary to the weight of the evidence." *Merrill v. Oklahoma Tax Commission,* 1992 OK 53 ¶ 7, 831 P.2d 634, 640–41. The record reflects that there was ample evidence to support the trial court's decision to choose the Governor's Plan over the Senate Plan. The trial court's judgment is, therefore, affirmed.

### AFFIRMED.

HARGRAVE, C.J., HODGES (joins LAVENDER, J.), LAVENDER (by separate writing), KAUGER, SUMMERS, BOUDREAU, WINCHESTER, JJ.—concur.

OPALA, J. (by separate writing)—concurs in part, dissents in part.

LAVENDER, J., concurring specially:

¶ 1 The United States Supreme Court has decided that issues of the sort now before us are of a justiciable nature. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)(involving reapportionment of State of Tennessee General Assembly). The United States Supreme Court has also unequivocally determined that the United States Constitution leaves with the States, including a

State's judicial branch in appropriate circumstances, the primary responsibility for apportionment of their federal congressional and state legislative districts. *Growe v. Emison,* 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993)(three-judge federal district court panel required to defer to state court's timely efforts to redraw legislative and congressional districts). The Oklahoma Constitution at Article 7, § 7(a) provides in pertinent part that "[t]he District Courts [of the State of Oklahoma] shall have unlimited original jurisdiction of all justiciable matters...." Further, the Oklahoma Constitution at Article 7, § 4 reposes in this Court the appellate jurisdiction to review the decisions of our District Courts. The simple fact is that the Oklahoma state courts and an appropriate federal court have concurrent subject matter jurisdiction over the controversy presently before us. It would be wrong, therefore, for this Court to rule favorably on Appellants' request (made at page four of their June 20, 2002 response brief in this case) that we merely vacate the lower court's judgment entered in this matter and "allow the three-judge [panel for the] Federal District Court for the Western District of Oklahoma to adopt a new congressional plan for use in this year's elections." Such a course might be the easier one for this Court to follow, but it would not be the course charted by the United States Constitution, the Constitution of the State of Oklahoma, or the laws of this State or Nation.

¶ 2 Title 2 U.S.C. § 2c (2000) provides as follows:

In each State entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of section 2a(a) of this title, there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative (except that a State which is entitled to more than one Representative and which has in all previous elections elected its Representatives at Large may

elect its Representatives at Large to the Ninety-first Congress).

As I understand the import of the above federal statute the five congressional House of Representative Members from Oklahoma that will be elected by virtue of the upcoming election cycle are supposed to be elected from districts "established by law". As everyone is aware, the current districts that have been in place for about ten years can no longer be used. This is so because Oklahoma is losing a Representative—we are going from six to five—and there are presently six districts rather than five.

¶ 3 I recognize, as I am sure my colleagues on this Court do also, that it was the legislative and executive branches of our State government that had, within their respective roles in the passage and approval of a valid law, the initial and primary responsibility for promulgating a law accomplishing congressional redistricting. I also recognize that no such law was passed by both houses of our State Legislature and approved by the Governor during the recently concluded legislative session. Such recognition is in no way intended to denigrate the co-equal legislative or executive branches of Oklahoma's government, but merely to point out that without court intervention at this juncture no valid congressional redistricting will occur prior to the upcoming election cycle because, practically, there is no reasonable chance that the legislative and executive branches will have the opportunity to again revisit the issue in a timely manner. Although I do not relish having to be involved in the process of congressional redistricting, I simply do not believe I have the luxury of merely passing this matter off on some other court. In that the District Court had subject matter jurisdiction of a justiciable controversy this Court has the duty and responsibility to review the lower court's judgment that was entered.

¶ 4 I am authorized to state that Justice Hodges joins in the views expressed herein.

OPALA, J., dissenting in part.

¶ 1 I concur in the court's opinion insofar as it holds that the district court had subject matter jurisdiction and that the State Election Board is not an essential party to the action. Its absence is not an impediment to granting relief. I dissent from today's approval of the district court's drawing of Oklahoma's congressional districts. This case is about neither jurisdiction nor testing the constitutional orthodoxy of legislation. Here the parties camouflage legislative nonfeasance by manipulating the judiciary into filling a political vacuum with a judicially-created districting plan. The law does not allow the judiciary to be a roving commission, filling such political voids. Because no party in this lawsuit established that federal congressional districts must be drawn *by anyone—much less by this court*—and the judiciary should not intrude upon areas where there are no cognizable injuries to be redressed, I recoil from any holding which dignifies this dispute by raising it to a redressible claim.

## I

## THE ANATOMY OF LITIGATION

¶ 2 The difficulty of determining "plaintiffs" and "defendants" in this "lawsuit" should give the court pause in assuming that a cognizable claim exists. In the original petition, dated January 29, 2002, plaintiffs Alexander and Snipes sued Governor Frank Keating, members of the Oklahoma State Election Board, Stratton Taylor (the President Pro Tempore of the Oklahoma State Senate) and Larry E. Adair (Speaker of the Oklahoma House of Representatives), all in their respective official capacities. Plaintiffs, as registered voters with an interest in participating in the 2002 elections for members of Congress from the State of Oklahoma, sought "injunctive relief to ensure that the State of Oklahoma has a constitutional redistricting plan in place in time to comply with the filing deadline for congressional elections in Oklahoma." They based their claim on Article 1, § 2 of the U.S. Constitution, as amended by § 2 of the Fourteenth Amendment. For reasons I will discuss in Part II, the petition should have been dismissed for failure to state a claim for which relief may be granted.

¶ 3 Among other various interventions and realignments of the parties in this case, the Election Board officials were dismissed as

defendants, and Governor Keating, a Republican, switched from a defendant to a plaintiff, separating himself from defendants Taylor and Adair, both Democrats. These shifts took place presumably to align more clearly the dominant political interests against one another, lest any court manage to mistake this case for anything *more* than partisan bickering.

## II

## FAILURE TO STATE A COGNIZABLE INJURY AND REDRESSIBLE CLAIM

¶ 4 Plaintiffs argue that Art. I, § 2 of the U.S. Constitution, as amended by § 2 of the Fourteenth Amendment, necessitates court action in this case. In my roughly fifty years in the law, I have become fairly familiar with the United States Constitution and the jurisprudence interpreting it. I am unable to make the jump from Art. I, § 2's command that "representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state ..." and the Fourteenth Amendment to the claim that this (or any other) court must draw such districts when they do not exist. And they clearly do not exist.

¶ 5 Once the results of 2000 decennial census—particularly, that the number of representatives to which Oklahomans are entitled to elect decreased from six to five—were made known, the Oklahoma Congressional Redistricting Act of 1991, 14 O.S.2000 §§ 5.1 et seq., became *functus officio*[1]—necessarily

obsolete and immediately invalid. This leaves Oklahoma capable of electing five representatives, but with *no* congressional districts. The judiciary's function is to subject districting plans that are in effect to constitutional testing under the Marshall Doctrine of judicial review. Here, there is nothing to test but legislative vacuum! I remain unconvinced that without congressional districts, the resulting situation—election at-large for each congressional seat—while likely unpalatable to all here involved, is *unconstitutional* on any grounds. Neither plaintiffs-appellees nor defendants-appellants bothered to mention why an at-large election for all five congressional seats would be illegal.

¶ 6 It is no more my job to attempt to craft a cognizable claim than it is to remedy a nonexistent injury. But for the sake of argument and legal education I will attempt to imagine what possible injury this case was meant to redress. First, I recognize that 2 USCS § 2a(c)(5) states that "Until a State is redistricted in the manner provided by the law thereof after any apportionment, ... if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large." Perhaps if the parties gave this statute any thought (and no evidence of any such thought exists) they felt that 2 USCS § 2c repealed this statute by implication.[2]

¶ 7 Perhaps the parties were encouraged in this reading by a three-judge federal panel which read these possibly overlapping stat-

1. *Functus officio* literally means "a task performed." It is applied to things which have "fulfilled the function, discharged the office, or accomplished the purpose, and [are] therefore of no further force or authority." *Black's Law Dictionary, Special Deluxe Fifth Edition,* (1979), p. 606. *See Macy v. Board of County Com'rs,* 1999 OK 53 at n. 21, 986 P.2d 1130.

2. As Justice Lavender notes in a concurrence, 2 USCS § 2c states that,
In each State entitled in the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of subsection (a) of section 22 of the Act of June 18, 1929, entitled "An Act to provide

for apportionment of Representatives" (46 Stat. 26), as amended [2 USCS 2a(a)], there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative (except that a State which is entitled to more than one Representative and which has in all previous elections elected its Representatives at Large may elect its Representatives at Large to the Ninety-first Congress).
§ 2a(c)(5) was passed in 1929, while § 2c was passed in 1967. Both are still in force.

utes this way in *Shayer v. Kirkpatrick.*[3] *Shayer* was summarily affirmed by the Supreme Court,[4] and this vague swipe is the nearest the Court has come to interpreting the two statutes. Its inconclusive approval is insufficient evidence that federal law mandates a division into districts rather than an at-large election.

¶ 8 Several reasons bolster such a belief. First, repeals by implication are not favored.[5] Second, *Shayer* was not a petition for certiorari, but an *appeal* from a Federal District Court panel, which obligated the Court to decide the matter in some way. Third, summary affirmations of cases with multiple issues may hold little and frequently hold nothing of precedential value.[6] In *Mandel v. Bradley*[7] the Court held that, "because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below." [8]

¶ 9 *Mandel* created a two-step test for courts to apply in determining the quantum of precedential weight, if any, of the Court's summary dispositions. First, the lower court must establish *exactly* what issues were presented in light of all the facts in the prior case. Second, the court must determine if the Supreme Court necessarily decided those issues when it summarily disposed of the case.[9] In an enlightening concurring opinion, Justice Brennan wrote that state and federal judges hoping to glean information from a summary affirmation must determine that the affirmation ... *"not even arguably [rests] upon some alternative ... ground.* The judgment should not be interpreted as deciding the constitutional questions unless no other construction of the disposition is plausible." [10] It is *eminently* plausible that the Court's affirmance of *Shayer* could have rested on any number of other grounds. I therefore decline to follow the *Shayer v. Kirkpatrick* opinion's construction of the federal statutes at issue.

¶ 10 Rather, I read the provisions of 2 USCS § 2c to hold that they prohibit a *legislature* from deliberately designing a redistricting plan which would elect at-large representatives, but find them silent about

3. 541 F.Supp. 922 (W.D.Mo.1982).

4. *Schatzle v. Kirkpatrick,* 456 U.S. 966, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982). Summary affirmances such as this are simply dispositions *sans* an explicitly-reasoned decision-making process; they merely affirm the judgment of a lower court without explanation.

5. *See, e.g., Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm.,* 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334 (1968) (citing *Wood v. United States,* 16 Pet. 342, 363, 10 L.Ed. 987 (1842); *FTC v. A.P.W. Paper Co.,* 328 U.S. 193, 202, 66 S.Ct. 932, 936, 90 L.Ed. 1165 (1946)).

6. The precedential value of summary dispositions is often difficult to determine. According to one scholar, as of 1995, with regard to federal appellate summary affirmations,
    The Federal Circuit has stressed that a summary disposition should not be viewed as a blanket adoption of the district court's reasoning because it may be based upon "any ground appropriate to the case." *Quad Envtl. Tech. Corp. v. Union Sanitary Dist.,* 946 F.2d 870, 874 (Fed.Cir.1991). In the District of Columbia, Second, Third, Seventh, Eighth, and Ninth Circuits, summary dispositions are not precedential. D.C. CIR. R. 11(c); 2D CIR. R. 0.23; 3D CIR. I.O.P. 5.6; 7TH CIR. R. 53(b)(2)(iii); 8TH CIR. R. 47B, APP. I; 9TH CIR. R. 36–3. Tenth Circuit Rule 36.3, denying precedential

status to summary dispositions, has been suspended. [*See In re Rules of the U.S. Court of Appeals for the Tenth Circuit,* 955 F.2d 36, 36 (10th Cir.1992) (giving historical background supporting court's decision to adopt rule that denies precedential weight to unpublished opinions except under doctrines of law of the case, collateral estoppel, and res judicata).] The Federal Circuit allows citation to every disposition of the court except those unanimously designated as nonprecedential. FED. CIR. R. 47.8. Rules permitting summary dispositions in the remaining circuits are silent about the precedential value (other than preclusive effect) of such dispositions. 1ST CIR. R. 27.1; 4TH CIR. R. 34(a); 5TH CIR. R. 47.6; 6TH CIR. R. 19.
    Martha J. Dragich, Will the Federal Courts of Appeal Perish if they Publish? Or does the Declining use of Opinions to Explain and Justify Judicial Decisions Pose a Greater Threat?, 44 Am. U.L.Rev. 757, 763 at n.21.

7. 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (per curiam).

8. *Id.* at 176, 97 S.Ct. 2238.

9. *See Id.* at 175–80, 97 S.Ct. 2238.

10. *Id.* at 180, 97 S.Ct. 2238 (Brennan, J., concurring) (emphasis added).

*forcing* a court *affirmatively* to *create* districts when the legislative nonfeasance results in the plainly constitutional regime of at-large elections. Public policy and judicial independence counsel such a reading. Since the effect of the 2000 census was to immediately invalidate the 1991 congressional districts and precipitate at-large elections in accordance with the terms of 2 USCS 2a(c)(5), and there is no clear command for a *sine qua non* requirement to divide states with multiple congressional representatives into districts, I cannot accede to the court's view that a *legally redressible* claim or counterclaim exists.

## III

### *DE NOVO* STANDARD OF REVIEW FOR CONSTITUTIONAL ISSUES

¶ 11 The court is also in error by assigning excessive deference to the trial court's order. It adopts the equity standard of review. This standard falls short of the federal minimum for constitutional issues. The latter require *de novo* review.[11] Originating with the 1920 case of *Ohio Valley Water Co. v. Ben Avon Borough,*[12] the so-called *Ben Avon* doctrine requires full judicial review when a constitutional issue is raised.[13] Some commentators speculate that the *Ben Avon* doctrine has been extinguished gradually through numerous inconsistent Supreme Court decisions.[14] **Nonetheless, the Su-**

**preme Court has never expressly overruled the doctrine, and courts continue to and are bound to apply it.**[15] Despite the parties' failure to prove a constitutional *injury,* constitutional *issues* are clearly alive and well in this case.

¶ 12 When a court reviews the rulings or reasoning of a trial court *de novo,* it gives little or no deference to the trial judge. The reviewing court's objective is not limited to ascertaining whether the lower court erred. "As such, it is not only at liberty, but is required, to comb the record in search of the facts of the case, the reasonable inferences from those facts, the law applicable to those facts, and proper inferences to be drawn from those facts."[16] In 1991, Justice Blackmun eloquently described the benefit of *de novo* review:

Independent appellate review of legal issues best serves the dual goals of doctrinal coherence and economy of judicial administration. District judges preside alone over fast-paced trials: Of necessity they devote much of their energy and resources to hearing witnesses and reviewing evidence. Similarly, the logistical burdens of trial advocacy limit the extent to which trial counsel is able to supplement the district judge's legal research with memoranda and briefs. Thus, trial judges often must resolve complicated legal questions without benefit of 'extended reflection [or] extensive information.' Courts of appeals, on the other hand, are structurally suited to

**11.** *See generally* Rev. John. J. Coghlin, A Comparison of the Administrative Law of the Catholic Church and the United States, 34 Loy. L.A. L.Rev. 81, 183.

**12.** 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908 (1920).

**13.** *See id.* At 289.

**14.** *See, e.g.,* Leslie A. Glick, Independent Judicial Review of Administrative Rate-Making: The Rise and Demise of the Ben Avon Doctrine, 40 Fordham L.Rev. 305, 306–07, 314 (1971). For an inconsistent decision, see *Railroad Commission v. Rowan & Nichols Oil Co.,* 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368 (1940).

**15.** Coughlin, *supra* note 11 at FN 687 and accompanying text. *See* Glick, supra note 687, at 313 n. 32, 314. *See generally California v. South-*

*land Royalty Co.,* 436 U.S. 519, 525–26, 98 S.Ct. 1955, 1958, 56 L.Ed.2d 505 (1978) (upholding an administrative interpretation of the Natural Gas Act on the ground that the interpretation was reasonable); *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 52, 56 S.Ct. 720, 726, 80 L.Ed. 1033 (1936) (holding that courts must review constitutional issues independently from the findings of the Secretary of Agriculture); *Pichotta v. City of Skagway,* 78 F.Supp. 999, 1004 (D.Alaska 1948) (stating that when a case presents an issue of constitutional law, the reviewing court may determine the issue upon its own, rather than the administrative, record); *Atl. Coast Line R.R. Co. v. Pub. Serv. Comm'n,* 77 F.Supp. 675, 680 (D.S.C.1948) (stating that an independent action in equity brought pursuant to an act of Congress deserves de novo review).

**16.** 2 J.App. Prac. & Process 47–2–47, nn. 63–4 and accompanying text.

the collaborative juridical process that promotes decisional accuracy. With the record having been constructed below and settled for purposes of the appeal, appellate judges are able to devote their primary attention to legal issues. As questions of law become the focus of appellate review, it can be expected that the parties' brief will be refined to bring to bear on the legal issues more information and more comprehensive analysis than was provided for the district judge. Perhaps most important, courts of appeals employ multi-judge panels that permit reflective dialogue and collective judgment.[17]

The record indicates that this was certainly a "fast-paced" trial, and the *Ben Avon* doctrine commands us to exercise *de novo* review of the exigent constitutional issues.

## IV

### THE CRUCIAL IMPORTANCE OF JUDICIAL NEUTRALITY IN DEALING WITH POLITICAL ISSUES

¶ 13 Judges act without authority and erode whatever faith the public still carries in the insulation of the judiciary from the political process when they limit themselves to choose between two proposals for redistricting congressional seats both obviously laden with partisan advantage. The reapportionment process has been recognized by many observers as politics at its most heated.[18] Indeed, since judicial redistricting "is inevitably an exposed and sensitive" task, it "must be accomplished circumspectly, and in a manner 'free from any taint of arbitrariness or discrimination.' "[19]

¶ 14 Even if I were convinced that the *Shayer v. Kirkpatrick* interpretation of 2 U.S.C.S. §§ 2a(c)(5) and 2(c) was indeed appropriate (or that the Supreme Court's nebulous affirmation of that case could be accepted as precedential authority for the view that districts must indeed be drawn), I would nonetheless disagree with the court's approval of the trial court's approach and reverse the trial court's adoption of a party-sponsored plan as a judicial abnegation of political neutrality.

¶ 15 The costs of potentially compromising the political neutrality of the court system far outweigh any benefits gained by simply choosing from ready-made and obviously partisan plans. Put simply, even if a federal mandate compelling courts to apportion districts *did* exist, the court must do so in a scrupulously neutral manner, free of any appearance of political influence. This would likely mean drawing districts neither party has suggested based on clearly definable, neutral criteria.[20] I am most certainly aware of Justice Ginsburg's teaching that "[T]he slim judicial competence to draw district lines weigh heavily against judicial intervention in apportionment decisions...."[21] But when courts claim this reluctance to intrude on a legislative process in order to shift the burden of drawing districts to the political parties who bring suits before them, the reputation costs incurred by punting to a political party are simply intolerable.

**17.** *See Salve Regina College v. Russell,* 499 U.S. 225, 231–232, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (alteration in original) (citations omitted).

**18.** *See generally* Robert Redwine, Comment: Constitutional Law: Racial and Political Gerrymandering—Different Problems Require Different Solutions 51 Okla. L.Rev. 373 (1998); Note: Federal Court Involvement in Redistricting Litigation, 114 Harv. L.Rev. 878 (2001). Pamela S. Karlan, The Fire Next Time: Reapportionment After the 2000 Census, 50 Stan. L.Rev. 731, 731–34 (1998).

**19.** *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977) (quoting *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964)).

**20.** Some may argue that announcing in advance that a court will solely limit itself to choose the most reasonable proposal may encourage the interested parties to work towards the political middle on their own. Such an argument would go on to note that political actors are likely better suited to make such plans than are judges. I may well agree, but hold that such a scheme still intolerably sullies a court in politics by expressly placing itself at the mercy of political actors.

**21.** *Miller v. Johnson,* 515 U.S. 900, 935, 115 S.Ct. 2475, 2500, 132 L.Ed.2d 762 (1995) (Ginsburg, J., dissenting).

## V

### MY PROPOSED DISPOSITION OF THIS CONTROVERSY

¶ 16 In sum, if I were deciding this case, I would declare the claims and counterclaims in this controversy to be irredressible for want of any law to which judicial testing of constitutional orthodoxy may be appropriate, and I would invite the federal three-judge panel (or any other court drawing districts) to revisit this important issue. Even if I were convinced that this court is under a constitutional mandate to draw districts for Oklahoma, in an attempt to keep the judiciary above reproach, I would most certainly avoid deferring to either of two party-sponsored plans. I am not unduly critical of the court's approval of the Governor's plan, nor do I counsel the court to adopt the Senate plan; rather, I rise today to condemn the decisional process by which these irredressible claims came to be decided. I do not invite this or any court ever to be bound by *any* tendered party-sponsored plan laden with *excisable* partisan bias, however slight.[22]

¶ 17 It is only when courts discipline the parties involved by refusing to function as a safety valve for political actors (who increasingly favor using the judiciary as a forum for resolving their disputes) that they will truly feel compelled to negotiate a solution on their own. The court has no business cleaning up this political mess, and I retreat from any such enterprise.

---

**22.** At oral argument, neither party denied that both party-sponsored plans were at least "slightly biased."